**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:17-cv-02411-NYW

DREW MILLER,

      Plaintiff,

v.

INSTITUTE FOR DEFENSE ANALYSES, a Delaware Non-Profit Corporation

      Defendant.

---

### DEFENDANT'S ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT

---

Defendant Institute for Defense Analyses ("Defendant"), by and through its undersigned counsel, respectfully submits its Answer and Defenses to Plaintiff's Complaint ("Complaint") as follows:

### NATURE OF THE ACTION

1.    This is an action primarily alleging multiple acts of Defense contractor whistleblower reprisal, constituting a continuous course of conduct, by the Defendant, Institute for Defense Analyses ("IDA"), which previously employed Dr. Miller. Dr Miller alleges IDA retaliated against him on eleven (11) separate occasions by taking various adverse employment actions against him, and by ultimately terminating his employment. He alleges that IDA took each of these retaliatory actions, engaged in the continuous course of conduct described, because Dr. Miller had correctly and properly alleged and internally reported IDA's gross waste and misuse of Department of Defense ("DoD") funds relating to one or more DoD contracts with IDA. Dr. Miller alleges

retaliation claims under both the False Claims Act ("FCA") and the Defense Contractor Whistleblower Protection Act.

    <u>RESPONSE:</u>  Defendant admits it formerly employed Plaintiff, admits that Plaintiff accurately summarizes Plaintiff's allegations in the lawsuit, and denies all other allegations in Paragraph 1.

2.    Dr. Miller also alleges, on behalf of the United States, that IDA presented one or more false or fraudulent claim(s) for payment to DoD in connection with IDA's gross waste and misuse of DoD funds paid to IDA for work performed on one or more contracts.

    <u>RESPONSE:</u>  Defendant denies the allegations in Paragraph 2.

3.    Dr. Miller also alleges that IDA violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., by failing to pay him compensation for all hours worked at his regular rate of pay during several periods when he was assigned duty and performed work for IDA in Iraq.

    <u>RESPONSE:</u>  Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.[1]

4.    Dr. Miller also alleges that IDA prohibited him from submitting a letter to the editor of a newspaper in support of Dr. Miller's friend and then-Senator Chuck Nagel, who was under consideration by the incoming administration of President Trump for the position of Secretary of Defense. Dr. Miller alleges that IDA thereby violated Colorado state law that prohibits employers from preventing employees from participating in political activity.

    <u>RESPONSE:</u>  Defendant admits that Paragraph 4 accurately summarizes Plaintiff's allegations in the Complaint, but denies taking any action in violation of Colorado law.

---

[1] Defendant seeks dismissal of Plaintiff's FLSA claim in the contemporaneously filed Partial Motion to Dismiss.

5.      Dr. Miller also alleges that IDA terminated his employment in violation of Colorado state law for engaging in the lawful off-duty activity of writing and publishing an article in a national journal, which did not identify himself or its content as having any affiliation with IDA.

RESPONSE:   Defendant admits that Paragraph 5 accurately summarizes Plaintiff's allegations in the Complaint, but denies taking any action in violation of Colorado law.

## JURISDICTION AND VENUE

6.      Jurisdiction over Dr. Miller's DoD contractor whistleblower retaliation claim is based upon 10 U.S.C. §2409(c)(2) and 28 U.S.C. § 1331.

RESPONSE:  Paragraph 6 is a legal conclusion, to which no response is required.

7.      Jurisdiction over Dr. Miller's FCA claim is based upon 31 U.S.C. § 3730(b)(1) and 28 U.S.C. § 1331.

RESPONSE:  Paragraph 7 is a legal conclusion, to which no response is required.

8.      Jurisdiction over Dr. Miller's FLSA claim is based upon 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

RESPONSE:  Paragraph 8 is a legal conclusion, to which no response is required.

9.      Jurisdiction over Dr. Miller's state law claim is based upon 28 U.S.C. § 1367 because it is so related to his whistleblower claim that it forms part of the same case or controversy.

RESPONSE:  Paragraph 9 is a legal conclusion, to which no response is required.

10.     Defendant is subject to personal jurisdiction in Colorado because it conducts substantial business in that state and the acts and omissions alleged herein occurred in that state.

RESPONSE:  Paragraph 10 is a legal conclusion, to which no response is required.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

RESPONSE:  Paragraph 11 is a legal conclusion, to which no response is required.

## THE PARTIES

12.     Dr. Miller is an adult individual residing in Colorado Springs, Colorado. He is a legal resident of the state of Colorado.

RESPONSE:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and, therefore, denies the allegations.

13.     IDA is a Delaware corporation, incorporated on February 20, 1961. Its primary business office and address is 4850 Mark Center Drive, Alexandria, VA 22311.

RESPONSE:  Defendant admits it is a Delaware corporation and its primary business address is alleged correctly in Paragraph 13, but denies the remaining allegations.

14.     IDA employed Dr. Miller since 2002, at various locations including its Virginia office, as well as in Iraq. Dr. Miller also performed work for IDA from his home in Colorado.

RESPONSE:  Defendant denies that it employed Plaintiff since 2002 and affirmatively states that Defendant brought Plaintiff on as a consultant first on March 5, 2003, until June 29, 2004, and again brought Plaintiff on as a consultant from December 22, 2004, until January 9, 2006, before converting Plaintiff to an adjunct employee on January 10, 2006. Defendant admits the rest of the allegations contained in Paragraph 14.

15.     At all times relevant to the Complaint, IDA was an employer within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(d).

RESPONSE:  Paragraph 15 is a legal conclusion, to which no response is required.

16.     At all times relevant to the Complaint, IDA was an enterprise with annual gross volume of business in excess of $500,000 and was engaged in interstate commerce.

RESPONSE:  Defendant admits the allegations contained in Paragraph 16.

17.     At all times relevant to the Complaint, IDA was a contractor, subcontractor, grantee, or subgrantee or personal services contractor, within the meaning of 10 U.S.C. § 2409(a)(1), which prohibits whistleblower reprisal against employees of such entities.

RESPONSE:  Paragraph 17 is a legal conclusion, to which no response is required.

18.     At all times relevant to the Complaint, IDA contracted with the United States government to perform various services, by which it was required to present records or statements in connection with the performance of those services and payment therefore. Dr. Miller alleges that IDA is liable for violations of the federal False Claims Act (FCA), 31 U.S.C. § 3729(a)(1) for presenting false or fraudulent claim(s) for payment.

RESPONSE:  Defendant admits that at all times relevant to the Complaint, Defendant contracted with the United States government to perform various services, by which it was required to present records or statements in connect with the performance of those services and payment therefore. The remaining allegations are legal conclusions, to which no response is required.

## General Allegations

19.     Plaintiff incorporates and realleges all prior paragraphs herein.

RESPONSE:  Defendant incorporates by reference all of its prior factual averments, denials, and defenses.

<u>Dr. Miller's Work History Prior to Joining IDA</u>

20.    Dr. Miller is an honor graduate of the U.S. Air Force Academy. Following graduation, he received an academic scholarship to Harvard University where he earned a Master's Degree. While serving on active duty as a US Air Force Intelligence Officer, Dr. Miller completed his doctorate degree in Public Policy and received his PhD from Harvard.

    <u>RESPONSE:</u>  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and, therefore, denies the allegations.

21.    Dr. Miller served 7 years on active duty, then continued his military service in the Air National Guard and then in the Air Force Reserve for a total of 30 years, retiring as a Colonel in the USAF Reserve.

    <u>RESPONSE:</u>  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and, therefore, denies the allegations.

22.    Dr. Miller also served as an elected County Commissioner in Nebraska for four years, and a University of Nebraska Regent for 12 years.

    <u>RESPONSE:</u>  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and, therefore, denies the allegations.

23.    Dr. Miller also served as a civilian employee of the Department of Defense ("DoD"), as a member of Senior Executive Service, and in many private business leadership positions.

    <u>RESPONSE:</u>  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and, therefore, denies the allegations.

Dr. Miller's Prior Work at IDA

24.     IDA is a Federally Funded Research and Development Center ("FFRDC"), a public-private partnership that conducts research for the U.S. government. In that capacity, it performs work pursuant to numerous contracts with the Department of Defense ("DoD"). IDA assigned Dr. Miller to perform work on projects for multiple DoD agencies, including the Defense Threat Reduction Agency ("DTRA"), a DoD agency.

        RESPONSE:  Defendant admits the allegations contained in Paragraph 24.

25.     Dr. Miller started his employment with IDA as a consultant. He quickly became an Adjunct Research Staff member since he was working more than half time.

        RESPONSE:  Defendant admits the allegations contained in Paragraph 25. Defendant affirmatively states that Defendant engaged Plaintiff as a consultant first on March 5, 2003, until June 29, 2004. Defendant engaged him as a consultant again on December 22, 2004, until January 9, 2006, at which point Defendant hired him as an adjunct staff member.

26.     Dr. Miller performed work in a wide variety of tasks at IDA, both for the Strategy, Forces and Resources Division ("SFRD"), and also in other Divisions. His performance reviews were overwhelmingly positive until the retaliation described and alleged herein.

        RESPONSE:  Defendant admits Plaintiff performed work in a wide variety of tasks for Defendant and for multiple divisions, but denies all remaining allegations in Paragraph 26.

27.     Dr. Miller's research work at IDA was used by the National Commission on the Structure of the Air Force, and cited in their final report.

        RESPONSE:  On information and belief, Defendant admits the allegations contained in Paragraph 27.

28.     Dr. Miller fully expected and planned to continue working at IDA for several more decades.

RESPONSE:   Defendant lacks knowledge or information sufficient to form a belief as to Plaintiff's expectations and plans and, therefore, denies the allegations contained in Paragraph 28.

29.     In 2008-2010, Dr. Miller traveled to Iraq on four occasions for extended periods ("deployments"), during which he worked full-time for Defendant in the status of a Research Staff Member. The sum total of these periods is approximately 13 months. Upon his return from these trips, Dr. Miller returned to his prior status as an Adjunct Research Staff member of Defendant.

RESPONSE:   Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.

30.     Dr. Miller received high praise at IDA specifically for his repeated tours of duty in Iraq. He provided valuable research and reports and recommendations for the Counter-IED program, helping to reduce casualties from this threat to U.S. military forces in Iraq. His work drew the attention of the Multi-National Force Iraq ("MNFI") and he was asked to do an additional tour of duty as an IDA deployed analyst at the U.S. headquarters in Baghdad. His analysis and briefing to then MNFI Commanding General David Petraeus was very well received, and led to adoption of his recommendations for an accelerated release and re-education program for Iraqi detainees.

RESPONSE:    Defendant admits that Plaintiff's performance reviews specifically referenced his tours of duty as a positive factor of his employment and that Plaintiff worked on a Multi-National Force Iraq ("MNFI") project that involved briefing General Patraeus.

31.     During his Iraq deployments, Dr. Miller worked an average of 70 hours per week, as did most other IDA employees.

RESPONSE:  Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.

32.     Only several years ago, Dr. Miller learned that other IDA employees who worked in overseas locations were paid for all of the hours they worked. IDA paid Dr. Miller only for 40 hours of work each week during these periods.

RESPONSE:  Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.

33.     In 2012, Dr. Miller became a permanent full time Research Staff Member of IDA, with full benefits. Dr. Miller was a resident of Nebraska and then Colorado during this period. Dr. Miller often traveled from Colorado to Washington DC for work at IDA, as well as often working from his home in Colorado for IDA.

RESPONSE:  Defendant admits that Plaintiff was converted to a permanent, full-time, salaried position in 2012. Defendant lacks knowledge or information sufficient to form a belief as to Plaintiff's residency during his employment and his travel habits and, therefore, denies these allegations.

Dr. Miller's work at IDA under authority of Dr. Jeff Grotte

34.     In 2013, the SFRD Division Director recommended that Dr. Miller focus on fewer areas and specialize more, in order to improve his value to IDA. This led Dr. Miller to work almost exclusively on a task for DTRA under the direction of Dr. Jeff Grotte.

RESPONSE:  Defendant admits the allegations contained in Paragraph 34, but denies that the alleged actions occurred in 2013.

35.     Dr. Miller performed "campaign analysis" work at IDA for DTRA in 2013. This work concerned an assessment of the likely impacts of the potential use of chemical and/or biological weapons on a military campaign in a country covered by DoD military planning scenarios. Dr. Miller made great progress in the performance of this work, which drew praise from several organizations in the DoD Chem-Bio Defense Program ("CBDP").

RESPONSE:  Defendant admits Plaintiff's work for DTRA in 2013 analyzed impacts of chemical and/or biological weapon attacks upon military personnel and campaigns. Defendant lacks knowledge or information sufficient to form a belief as to Plaintiff's remaining allegations in Paragraph 35 and, therefore, denies the remaining allegations.

36.     After DTRA approved the framework for the campaign analysis that Dr. Miller primarily drafted, Dr. Miller continued his work in this area by beginning to implement more detailed tasks within that framework.

RESPONSE:  Defendant admits the allegations contained in Paragraph 36.

37.     Dr. Jeff Grotte, IDA SFRD Assistant Director, exercised great independent authority and control over the work of Dr. Miller, and other analysts assigned to tasks within SFRD. Dr. Grotte was the IDA task lead and manager for Dr. Miller's work for DTRA within the CBDP.

RESPONSE:  Defendant admits the allegations contained in Paragraph 37.

38.     In the Fall of 2013, six (6) other analysts (employees) of IDA were working on a contract for research or related services concerning healthcare. The contract had nothing to do with DTRA or the specific campaign analysis Dr. Miller was working on. That contract lost funding. As a result, IDA either had to separate those employees from employment, employ them in a different capacity at IDA expense, or reassign them to a different federal government contract with IDA for

which they were fully qualified to perform the work required, and for which IDA had equivalent vacancies and a valid need. Instead, IDA assigned those 6 analysts to Dr. Miller's campaign analysis task.

RESPONSE:  Defendant admits that several analysts worked on a project different from DTRA or the specific campaign analysis project on which Plaintiff worked, that the project temporarily lost funding, and that Defendant assigned these analysts to the project on which Plaintiff worked on September 17, 2013. Defendant denies Plaintiff's characterization of the project as "healthcare" and affirmatively states that the project on which the analysts previously worked assessed and estimated casualties caused by various biological agents, and through that project, the analysts gained experience directly relevant to the 3250 task.

39.    None of these analysts possessed any qualifications, credentials, experience, or skills concerning military campaign analysis, or more specifically concerning the work for DTRA that Dr. Miller was working on. In fact, their assignment to Dr. Miller's task directed detracted from Dr. Miller's progress, and from much of the work he had accomplished during the previous half year.

RESPONSE:  Defendant denies the allegations in Paragraph 39.

40.    Dr. Grotte personally made the decision to reassign these 6 analysts from the healthcare task to Dr. Miller's DTRA campaign analysis. He made this decision in order to "cover" these now out-of-work analysts, for IDA's benefit, rather than accomplishing the research task for DTRA's benefit.

RESPONSE: Defendant admits that Dr. Grotte made the decision to assign the analysts to the 3250 DTRA campaign task and denies all other allegations in Paragraph 40.

Dr. Miller's Reporting of Waste/Misuse of DoD Funds, Dr. Grotte's/IDA's retaliations

41.     Dr. Miller promptly complained that Dr. Grotte's decision to reassign the 6 analysts to his task constituted a waste and misuse of DoD funds. He made this complaint directly to Dr. Grotte, and also to Dr. Grotte's deputy at IDA for this work, Jim Demyanovich. There were several well qualified and available IDA researchers Dr. Miller asked to add to the task instead, but Dr. Grotte did not approve this. Dr. Miller told Demyanovich that he wished to withdraw from leading the work, because of the wrongful assignment of the unqualified analysts, but Demyanovich encouraged Dr. Miller to press on with the assignment.

        RESPONSE:   Defendant denies that Plaintiff promptly complained to anyone that the decision to move the analysts to the 3250 project constituted a waste and misuse of DoD funds. Defendant admits that Plaintiff requested to bring on several other analysts, a request Dr. Grotte did not approve due to funding concerns and lack of familiarity with the individuals and their expertise. Defendant also admits that Plaintiff told Mr. Demyanovich that he wished to withdraw from leading the work and that Mr. Demyanovich encouraged Plaintiff to press on with the assignment.

42.     Contrary to Dr. Miller's complaint, Dr. Grotte insisted that Dr. Miller use the unqualified analysts. Dr. Grotte directed Dr. Miller to do this because the analysts were "his people" and he needed to "cover" their expense since their healthcare task work funding was temporarily lost. Although IDA could have chosen to continue to employ these individuals at IDA's expenses, the normal and proper IDA procedure, it did not do so. Instead, IDA billed DTRA for their time spent purportedly performing work on Dr. Miller's task. IDA thereby clearly wasted and misused DTRA and DoD funds.

RESPONSE:  Defendant admits it could have continued to employ these analysts at Defendant's expense and denies all other allegations in Paragraph 42.

43.     Dr. Miller continued to complain to Dr. Grotte about the unqualified analysts, and lack of progress on the DTRA military campaign analysis caused by their assignment.

RESPONSE:  Defendant denies the allegations in Paragraph 43.

44.     Jerry Glasow is a federal government employee of DTRA. Mr. Glasow is responsible for overseeing the expenditure of DTRA funds from its "3250" account. Mr. Glasow is himself a former IDA employee, who used to work directly for Dr. Grotte. Other IDA task leaders provide formal progress reports to their government clients at the clients' offices. By contrast, Dr. Grotte and Mr. Glasow frequently meet informally, often at Dr. Grotte's IDA office. Dr. Grotte obviously plays the role of the senior, with Mr. Glasow, who is officially in charge of the funds as a government employee, acting like the subordinate. IDA Research Staff members who noted this unusual, reversed role believe that Mr. Glasow hopes to replace Dr. Grotte at IDA when he retires (Dr. Grotte is much older than Mr. Glasow and the IDA position pays much more than the DTRA GS position). As a result, Dr. Grotte is effectively able to access and distribute DTRA funds from the "3250" account, controlled by Glasow, to whatever IDA projects and purposes he chooses. The "3250" account thus serves as Dr. Grotte's "slush fund" (the wording IDA staff members often used to refer to this fund), money for IDA's use at taxpayer expense. IDA billed the DTRA "3250" account for the work of the unqualified analysts.

RESPONSE:  Defendant admits that Jerry Glasow was employed at DTRA, that he oversaw expenditure of DTRA funds for the 3250 task, and that he previously reported to Dr. Grotte. Defendant lacks knowledge or information sufficient to form a belief as to the research

staffs' beliefs about whether Mr. Glasow hoped to replace Dr. Grotte once Dr. Grotte retires and, therefore, denies this claim. Defendant admits that it billed DTRA for work completed on the 3250 task. Defendant denies all other allegations in Paragraph 44.

45.     Dr. Miller's complaints about Dr. Grotte's misuse and waste of the DTRA funds angered Dr. Grotte. Because of Dr. Miller's complaints, Dr. Grotte retaliated against Dr. Miller by first getting Mr. Glasow's approval to abandon the DTRA campaign analysis task and obtaining Mr. Glasow's OK to work on a variety of research papers (to employ the 6 uncovered healthcare analysts) — which resulted in additional waste of DTRA funds.

        RESPONSE:  Defendant denies the allegations in Paragraph 45.

46.     In November 2013, Dr. Grotte directed an order to cease work on the DTRA campaign analysis and operational risk assessment task work. Dr. Grotte shifted all of the analysts completely away from the campaign analysis effort Dr. Miller had been working for over half a year (and which was not completed). Instead, Dr. Grotte directed the unqualified analysts to perform very different work involving an effort to write a half-dozen research papers.

        RESPONSE:  Defendant admits that Dr. Grotte directed an order to cease work on the DTRA campaign analysis and operational risk assessment task work in November 2013 and that the analysts were reassigned to writing research papers. Defendant denies all other allegations in Paragraph 46.

47.     Dr. Grotte directed this change in order to "make work" for the unqualified analysts, and not for any legitimate reason or requirement related to the task IDA was performing for DTRA. In doing so, Dr. Grotte effectively wasted all of the time and effort Dr. Miller had already expended

on the previous work — for which IDA had billed DTRA in amounts totally several hundred thousands of dollars.

RESPONSE:  Defendant denies the allegations in Paragraph 47.

*Retaliation #1:*

48.    Dr. Grotte then cut Dr. Miller off from any DTRA 3250 task fund work since he had complained about the misuse of this fund.

RESPONSE:  Defendant denies the allegations in Paragraph 48.

49.    Due to Dr. Grotte's direction to cease work on the DTRA campaign analysis, Dr. Miller had to take leave to cover his hours while looking for other appropriate work in other areas of IDA. He was the only IDA employee treated this way. Dr. Miller moved out of Dr. Grotte's CBDP team work area because he was now "persona non-Grotte" (as Research Staff Members at IDA put it) for daring to challenge Dr. Grotte's absolute authority and control, and complaining about misuse of DoD funds.

RESPONSE:  Defendant admits that Plaintiff had to take leave to cover his time while looking for other work and that the other analysts did not have to because they were staffed on other projects. Defendant lacks knowledge or information sufficient to form a belief as to whether other research staff members at Defendant used the term "persona non-Grotte" and, therefore, denies the allegation. Defendant denies all other allegations in Paragraph 49.

50.    Dr. Miller sent a memo to the SFRD Division Director complaining about both Dr. Grotte's misuse of CBDP funds (violation of IDA practice 1-01), and the 3250 "slush fund" controlled by Dr. Grotte and the subservient Mr. Glasow at DTRA.

RESPONSE:  Defendant denies the allegations in Paragraph 50.

51.     Dr. Grotte awarded CBDP work to other off-site IDA Adjunct Staff Members from late 2013 into 2014, but not Dr. Miller. DTRA paid IDA for this work, which included paying for the travel of several of these employees, from the DTRA 3250 fund. Prior to Dr. Miller's objection to DTRA 3250 fund misuse, Dr. Grotte had praised Dr. Miller's work and had him present at several CBDP meetings. But now, Dr. Grotte banned Dr. Miller from work on "his tasks" to retaliate for Dr. Miller's protest against improper, wasteful use of DTRA funds.

RESPONSE:  Defendant admits that adjunct staff members were placed on CBDP tasks from late 2013 into 2014 and that Plaintiff was not and that DTRA paid for this work, including work done on the 3250 task. Defendant also admits that Plaintiff had previously presented at CBDP meetings. Defendant denies all other allegations in Paragraph 51.

*Retaliation #2:*

52.     In January 2014, Dr. Miller attempted to find new work in other parts of IDA where he was qualified to contribute. Dr. Miller did the right thing for an IDA employee to do in between work tasks—he went to his Division Director to arrange for other work and, until available, worked on an IDA-funded "CRP" task. The SFRD Division Director, Mike Dominguez, arranged for a CRP to help cover Dr. Miller's time. Unfortunately for Dr. Miller, it was in a research area still under Dr. Grotte's control. Dr. Grotte subsequently directed that the bulk of these CRP hours go to a junior analyst on "his team" that he favored, rather than Dr. Miller.

RESPONSE:  Defendant admits that Plaintiff attempted to find work in other areas of IDA, that Mr. Dominguez set up a CRP task on which Plaintiff worked, and that the CRP was under the direction of Dr. Grotte. Defendant denies all other allegations in Paragraph 52.

*Retaliation #3:*

53.     In March 2014, via Dr. Grotte's deputy, Mr. Demyanovich, Dr. Grotte submitted negative performance review inputs for Dr. Miller. This included false information and damaging reviews on work tasks where neither Dr. Grotte nor Mr. Demyanovich were involved in the work. Dr. Grotte brings several millions of dollars to IDA in dozens of research grants every year that employ about two dozen personnel. Dr. Grotte often does not do any work in the tasks, but has control over who can spend the funds and what gets written about their work in performance reviews. Dr. Grotte took this action to retaliate against Dr. Miller for his complaints about the misuse and waste of DTRA funds.

RESPONSE:  Defendant admits that Plaintiff received a negative performance review in March of 2014 and denies all other allegations in Paragraph 53.

54.     Dr. Miller again complained about the misuse and waste of DTRA funds, and also Dr. Grotte's retaliation against him, in a memo to the SFRD Division Director in April 2014. He never received any reply.

RESPONSE:  Defendant admits that Plaintiff did not receive a reply to his memo, but denies all other allegations in Paragraph 54.

*Retaliation #4:*

55.     Mike Niles, an IDA Research Staff Member disclosed to Dr. Miller that Dr. Grotte had directed him to remove key portions of a study Dr. Miller had done under Niles' direction. Niles told Dr. Miller that Dr. Grotte did this because Dr. Grotte recognized those portions as Dr. Miller's work, and wanted them out of the study.

RESPONSE:  Defendant admits that Mike Niles removed portions of a study that Plaintiff had written, which removal was due to DTRA's decision to switch from the methodology used by Plaintiff to another methodology. Defendant denies all other allegations in Paragraph 55.

*Retaliation #5:*

56.     Later in 2014, Dr. Miller wrote an article on "The Age of Bioengineered Viral Pandemics and Collapse," based on his private research over the past several years, and absolutely no IDA task work. Dr. Grotte became aware of this article because of Dr. Miller's compliance with the IDA requirement of review and approval of personally written articles. Dr. Grotte did not want Dr. Miller's article to be published. However, the SFRD Division Director, Michael Dominguez, assigned it to a different Assistant Division Director other than Dr. Grotte for pre-publication review. This Assistant Division Director, Jim Thomasson, suggested a few minor changes, liked Dr. Miller's article, and recommended it for approval. It then received Division Director Mike Dominguez's approval for meeting IDA standards, an IDA publication number was put on it, it was submitted to IDA's Vice President, Mr. Phil Major, and approved for release as NSD-5335, an official IDA publication.

RESPONSE:   Defendant admits that Plaintiff wrote an article titled "The Age of Bioengineered Viral Pandemics and Collapse" ("the BVP Article") based on his private research, which he first submitted to Mr. Dominguez for approval for release on April 24, 2014, and which article was eventually approved for public release on November 12, 2014. Defendant admits that Mike Dominguez approved the paper, that it was assigned the document number NSD-5335, and that it was submitted to Phil Major. Defendant lacks knowledge or information sufficient to form

a belief as to how Dr. Grotte became aware of the article and, therefore, denies this claim. Defendant denies all other allegations in Paragraph 56.

57.     While this in effect meant that Dr. Miller's private work was taken by IDA to be cited and claimed as an IDA work product, Dr. Miller had no objection to this then, or now. His motivation was to provide public warning of the bioengineered viral pandemic threat, and to urge more preparations to deal with the inherent, largely unavoidable misuse of bioengineering technology advances to create lethal viruses and the pandemic that many scientists insist is "inevitable."

        RESPONSE:  Defendant lacks knowledge or information sufficient to form a belief as to Plaintiff's stated motivation for writing the BVP Article and, therefore, denies this claim. Defendant denies all other allegations in Paragraph 57.

58.     In Dec 2014, a year after Dr. Miller was forced to leave Dr. Grotte's CBDP work area, Dr. Miller requested IDA approval to make a presentation, on his own time and in his personal capacity, at an upcoming conference on the topic of "Psychological and social effects of CBRN [Chemical, Biological, Radiological, and Nuclear] events". IDA declined to approve Dr. Miller's request until he could find a government sponsor for the presentation, rather than do it as a private project. In early 2015, via IDA Research Staff Member Alec Wahlman, the National Guard Bureau (NGB) agreed to be a sponsor for Dr. Miller's presentation topic. Mr. Wahlman requested that Dr. Miller also do a short paper/study under his task on this topic, but could only authorize 10 hours of IDA work. Dr. Miller volunteered his own time to prepare the paper, knowing it would take well over 100 hours of donated time.

RESPONSE: Defendant lacks knowledge or information sufficient to form a belief as to Plaintiff's knowledge of how long it would take him to prepare the NGB paper and, therefore, denies this allegation. Defendant admits all the other allegations in Paragraph 58.

59.     In March 2015, SFRD Division Director Mike Dominguez assigned Dr. Grotte and Bob Zirkle to review the draft NGB paper Dr. Miller had prepared. On April 28, 2015, Dominguez told Dr. Miller that his paper had been condemned by the reviewers, and cited as a potential conflict of interest with Dr. Miller's unrelated personal and private involvement with "Fortitude Ranch" (a very small unadvertised prepper/recreational community project, that has generated no profit for several years, and which has no relationship with DoD or the government). Dr. Miller disagreed with Dr. Grotte's objections to the paper. However, IDA disapproved Dr. Miller's speaking engagement.

RESPONSE: Defendant admits the allegations in Paragraph 59.

60.     Despite this negative resolution of the matter concerning Dr. Miller's NGB paper and proposed presentation, Dr. Miller's May 2015 IDA Performance Review evaluation from Dominguez specifically cited and praised the article, and stated that it had been approved as an IDA document and submitted for publication. Since Dr. Miller was no longer working any IDA tasks under Dr. Grotte's review, he was not able to harm Dr. Miller during the 2015 performance review. IDA gave Dr. Miller a raise and bonus compensation.

RESPONSE: Defendant admits that Defendant provided Plaintiff with a raise and bonus compensation and that Plaintiff's performance review noted that Plaintiff had authored the NGB paper. Defendant denies all other allegations in Paragraph 60.

*Retaliations #6, #7, and #8:*

61.    On April 29 2015, Dr. Grotte made the very serious allegation that Dr. Miller had committed "scientific misconduct" in violation of IDA's Code of Conduct. Dr. Miller first learned of this via an email dated June 10, 2015. During IDA's investigation of this matter, Dr. Grotte later made additional related allegations against Dr. Miller. These additional allegations, which were baseless, charged Dr. Miller with racism, stealing from IDA, plagiarism, and also included unfounded attacks on his character. Dr. Miller provided a detailed response and rebuttal to all of these charges. IDA's completion of the investigation took months.

        RESPONSE:   Defendant admits that Dr. Grotte filed a Code of Conduct complaint against Plaintiff on April 29, 2015, alleging that Plaintiff committed scientific misconduct and plagiarism, and that the investigation took several months to complete. Defendant denies all other allegations in Paragraph 61.

62.    The detailed initial findings of the investigative committee and Dr. Miller's written reply to it document Dr. Grotte's clearly false allegation of scientific misconduct. Dr. Miller admitted only that he had made a minor quotation error in which he inadvertently dropped an ellipsis between two separate sentences in a quoted study.

        RESPONSE:   Defendant admits Plaintiff only admitted to a minor error and denies all other allegations in Paragraph 62.

63.    Via the scientific misconduct investigation of Dr. Miller that he triggered, Dr. Grotte engaged in an extensive effort to defame and get rid of Dr. Miller. Dr. Grotte personally conducted additional research, and wrote and submitted subsequent memos to the investigative committee, in which he alleged that Dr. Miller had committed plagiarism, and also personally attacked Dr.

Miller. In the initial interview by the investigation committee, Dr. Grotte added additional baseless charges against Dr. Miller, including racism and stealing from IDA for profit.

RESPONSE: Defendant admits Dr. Grotte submitted an additional memo to Mr. Major, but affirmatively states that he wrote that memo pursuant to Mr. Major's direction to submit additional information relevant to the scientific misconduct investigation. Defendant denies all other allegations in Paragraph 63.

64.     Not only was Dr. Grotte's accusation that Dr. Miller stole IDA work and attempted to publish it for personal financial gain provably false, in fact the opposite was true: IDA took Dr. Miller's private research and appropriated it into IDA-labeled publications in the course of IDA review and approval required for outside, personal work. IDA claimed as IDA work the private research that Dr. Miller had conducted himself, and which he had donated to IDA both for the earlier approved paper and the draft NGB report.

RESPONSE:  Defendant denies the allegations in Paragraph 64.

65.     Dr. Miller met with the Scientific Misconduct Investigation Committee, composed of three Assistant Division Directors in three separate divisions of IDA. Dr. Miller repeated to them and provided supporting documentation concerning how he had complained about Dr. Grotte's waste and misuse of DTRA funds in 2013, and how Dr. Grotte retaliated against him repeatedly since then. IDA Vice President Phil Major reviewed these documents.

RESPONSE:   Defendant admits that Plaintiff met with the scientific misconduct investigative committee, that the committee was composed of three Assistant Division Directors in three separate divisions of Defendant, and that Mr. Major reviewed documents submitted by Plaintiff.  Defendant denies all other allegations in Paragraph 65.

66.     Defendant completed its investigation of Dr. Grotte's allegations against Dr. Miller by the Fall of 2015, the process having taken about half a year. During this period, every day Dr. Miller came to work under the cloud of the unresolved investigation — itself a form of additional retaliation by Dr. Grotte. At its conclusion, Dominguez verbally and vaguely informed Dr. Miller that Dr. Grotte's "charges" had been dismissed. IDA did not provide Dr. Miller with a copy of its final report, if any. There was no apology by Dr. Grotte or IDA for the false charges of scientific misconduct, racism, plagiarism, stealing from IDA, or lying.

RESPONSE:  Defendant admits that it completed its investigations of conflict of interest and scientific misconduct in Fall 2015, that Mr. Dominguez spoke to Plaintiff concerning the conclusion of the investigation, and that Defendant did not provide a copy of the report (per Defendant policy) or apologize to Plaintiff. Defendant denies all other allegations in Paragraph 66.

67.     Dr. Miller later learned that Dr. Grotte had discussed the resolution of the investigation directly with senior IDA officials.

RESPONSE:  Defendant admits that Dr. Grotte discussed the resolution of the investigation with Defendant's management, as was appropriate and expected for an investigation that was directly in the lane of business over which Dr. Grotte had oversight responsibilities.

68.     Although IDA's investigation of Dr. Grotte's allegations against Dr. Miller did not result in the termination of Dr. Miller's employment, it nevertheless effectively ruined any possibility of Dr. Miller's continuation of his career at IDA.

RESPONSE:  Defendant denies the allegations in Paragraph 68.

*Retaliation #9:*

69.     At the end of 2015, with no other options offered or available to him because of Dr. Grotte's

retaliation, Dr. Miller reluctantly switched back to part-time Adjunct Staff Member status at IDA

and thereafter worked primarily from his home in Colorado.

        RESPONSE:  Defendant admits that Plaintiff converted to an adjunct employee, but denies

it was due to retaliation. Defendant lacks knowledge or information sufficient to form a belief as

to the allegation that Plaintiff worked primarily from his home in Colorado and, therefore, denies

this allegation.

*Retaliation #10:*

70.     In March 2016, a year after Dr. Grotte's first attempt to allege scientific misconduct against

Dr. Miller, Dr. Miller received notice of new false allegations against him concerning violation of

IDA practices. This time, SFRD Division Director Dominguez issued a memo prohibiting Dr.

Miller from performing any work in the chem-bio area that Dr. Grotte effectively controls and runs

for IDA, including any private (non-IDA) speaking, writing, or publication on that subject.

        RESPONSE:  Defendant admits that in March 2016 Mr. Dominguez issued Plaintiff a letter

of counseling prohibiting him from performing any work on BVPs and from speaking and writing

publicly on that subject. Defendant denies all other allegations in Paragraph 70.

71.     The memo again falsely accused Dr. Miller of violating IDA Practices by releasing IDA

research work, the same false charge (among many others Dr. Grotte leveled against him) in the

2015 scientific misconduct investigation that Dr. Miller had been found innocent of. The memo

discusses the 2015 scientific misconduct investigation, and admits that not only was Dr. Miller not

guilty of the charges of scientific misconduct, racism, stealing IDA material to sell for profit,

plagiarism, and other insults, but all that Dr. Grotte and IDA could find was "incorrect quotes, quotes taken out of context". As Dr. Miller stated throughout the investigation, the quotes were not incorrect, there was only the single minor error of inadvertently dropping an ellipsis between two quotations from the same source. This minor error did not result in any misrepresentation. Indeed, Dr. Miller provided additional quotations and Congressional testimony from the quoted author reiterating the conclusions Dr. Miller had cited.

RESPONSE:  Defendant admits that Plaintiff submitted additional information regarding the errors in his paper, and denies all other allegations in Paragraph 71.

72.    As documented in his 2015 reply to the scientific misconduct investigation committee, Dr. Miller has never performed any work for IDA on bioterrorism or bioengineering research projects. Dr. Miller has done his own private work on his own time on the subject of bioengineered pandemics, relying on public sources of information. Nevertheless, the 2016 IDA Memo to Dr. Miller again implied a false accusation that he had violated, or would violate, IDA Practice 5-10 banning "release to the public materials generated through IDA research." Dr. Miller never publicly released material generated through IDA research. Dr. Miller's record of work at IDA listing every task he has performed (and hours worked) shows no task work on bioengineering. As documented in his response to similar false charges in the 2015 scientific misconduct investigation, the reverse was true: Dr. Miller donated his private research and work to IDA tasks that could use the work (not tasks dedicated to bioengineering or pandemic threats).

RESPONSE:  Defendant admits that Plaintiff has never performed work for IDA on bioterrorism or bioengineering research projects, but states affirmatively that the 3250 task on which Plaintiff worked analyzed a related topic, chemical and biological *warfare* risks. On

information and belief, IDA admits that Plaintiff performed private research on BVP and relied on

public sources of information.  Defendant denies all other allegations in Paragraph 72.

*Retaliation #11*:

73.     Dr. Miller continued to work on some IDA task work, more than half time. In November

2016, an article Dr. Miller wrote on the bioengineered viral pandemic threat, based on his private

research, which Dr. Grotte had condemned, was published in The American Interest, a national

public policy journal. The article did not identify Dr. Miller as employed by or in any way affiliated

with IDA, and it otherwise made no reference to IDA.

        RESPONSE:  Defendant admits the allegations contained in Paragraph 73.

74.     On January 18, 2017, IDA terminated Dr. Miller's employment. Division Director

Dominguez told Dr. Miller that he was fired because of the article. A copy of the front page of the

article was handed to Dr. Miller by Mr. Dominguez at the time of this firing, but there was no

written memo or explanation for the firing provided by IDA.

        RESPONSE:  Defendant admits the allegations in Paragraph 74 and states affirmatively

that Plaintiff was not terminated solely in response to the American Interest Article.

75.     In February 2017, Dr. Miller filed a complaint with the DTRA Inspector General

concerning the waste and misuse of DTRA funds. He also filed complaints with DoD IG

concerning the same issue, as well as IDA's whistleblower retaliation against him.

        RESPONSE:  On information and belief, Defendant admits the allegations contained in

Paragraph 75.

<u>First Cause of Action — FCA Retaliation, 31 U.S.C. 4 3730(h)(1)</u>

76.     Dr. Miller incorporates and realleges all prior paragraphs herein.

RESPONSE:   Defendant incorporates by reference all of its prior factual averments, denials, and defenses.

77.     Dr. Miller was employed by Defendant IDA.

RESPONSE:   Defendant admits the allegation in Paragraph 77.

78.     IDA knew that the purported work performed by the unqualified analysts reassigned by Dr. Grotte to Dr. Miller's campaign analysis task was not adequate for payment by DTRA.

RESPONSE:   Defendant denies the allegation in Paragraph 78.

79.     IDA knowingly presented, or caused to be presented, one or more false or fraudulent claims for payment or approval in connection with the purported work performed by the unqualified analysts working outside their area of expertise because funding in their area of healthcare had been lost.

RESPONSE:   Defendant denies the allegations in Paragraph 79.

80.     Dr. Grotte directed and authorized fraudulent work for the unqualified analysts to "cover their expenses" with DTRA funds, reassigning them to Dr. Miller's campaign analysis task which detracted from progress and wasted DTRA funds. Dr. Grotte did so in order to prevent any negative impact or interruption in the employment of these individuals for IDA's benefit, at DTRA's expense.

RESPONSE:   Defendant denies the allegations in Paragraph 80.

81.     A person violates the FCA when he "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

RESPONSE:   Defendant admits the cited statute contains the quoted provision.

82.     Dr. Grotte's stop work order on Dr. Miller's campaign analysis task, and his order directing the unqualified analysts to perform the fraudulent "cover work", over Dr. Miller's objections, constitute false records or statements material to the false or fraudulent claim for compensation of IDA for the purported work performed by those analysts.

RESPONSE:  Defendant denies the allegations in Paragraph 82.

83.     Dr. Miller reported waste and misuse of DTRA and DoD funds to his work supervisors, task lead and Division Director. He later reported it to additional IDA leaders, including the Vice President of IDA. He then reported it to the DTRA and DoD Inspector Generals' Offices.

RESPONSE:  On information and belief, Defendant admits that Plaintiff reported alleged waste and misuse of funds to the DTRA and DoD Inspector Generals. Defendant denies all other allegations in Paragraph 83.

84.     By reporting the waste and misuse of DoD funds to Dr. Grotte and others at IDA, Dr. Miller engaged in conduct protected by 31 U.S.C. § 3730(h)(1).

RESPONSE:  Paragraph 84 is a legal conclusion, to which no response is required. To the extent that a response may be required, Defendant denies the allegations in Paragraph 84.

85.     Dr. Miller's reporting of IDA's waste and misuse of funds were lawful acts done in furtherance of an effort to stop one or more violations of the FCA, under 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B).

RESPONSE:  Paragraph 85 is a legal conclusion, to which no response is required. To the extent that a response may be required, Defendant denies the allegations in Paragraph 85.

86.     IDA retaliated against Dr. Miller on eleven occasions as detailed earlier, and ultimately terminated his employment with IDA, because of his protected activity.

RESPONSE:  Defendant denies the allegations in Paragraph 86.

87.     Dr. Miller is entitled to relief under 31 U.S.C. § 3730(h)(1) from the damages he suffered as a result of IDA's campaign of retaliation against him.

RESPONSE:  Defendant denies the allegations in Paragraph 87.

Second Cause of Action — Defense Contractor Whistleblower Retaliation

88.     Dr. Miller incorporates and realleges all prior paragraphs herein.

RESPONSE:  Defendant incorporates by reference all of its prior factual averments, denials, and defenses.

89.     Dr. Miller was an "employee" of IDA.

RESPONSE:  Defendant admits the allegation in Paragraph 89.

90.     IDA was, at all material times, a "contractor" because it was awarded a federal contract from the Department of Defense.

RESPONSE:  Defendant admits the allegations in Paragraph 90.

91.     During Dr. Miller's employment, Dr. Grotte wasted and misused DoD funds to help IDA "cover" the expense of unexpectedly unemployed IDA analysts unqualified to work on the campaign analysis task Dr. Miller had been successfully working for most of 2013. The assignment of six unqualified personnel to work the task stopped progress on the project and ultimately led to its cancellation, causing further waste and misuse of DoD funds.

RESPONSE:  Defendant denies the allegations in Paragraph 91.

92.     IDA knew or should have known that Dr. Grotte's assignment of unqualified personnel to the DTRA task was improper, and that Dr. Miller's objections followed IDA policy as well as DoD fraud, waste and abuse standards. All the personnel in Dr. Grotte and Dr. Miller's chain of

command were former DoD Senior Executive Service and senior DoD Undersecretaries. They knew that "covering" unqualified employees on a task they had no experience or ability to work was, while good for IDA's budget, was a waste of DoD funds. They also knew that it was illegal to retaliate against whistleblowers who report misuse of government funds.

RESPONSE:  Defendant admits that the personnel in Dr. Grotte's and Plaintiff's chain of command were former DoD senior members and denies all other allegations in Paragraph 92.

93.     In objecting to the assignment of unqualified, unemployed IDA employees to a work task they were unfit to perform, Dr. Miller disclosed information that he reasonably believed to be evident of gross mismanagement of a Department of Defense contract, and/or a gross waste of Department funds.

RESPONSE:  Defendant denies the allegations in Paragraph 93.

94.     IDA retaliated against Dr. Miller because of these disclosures.

RESPONSE:  Defendant denies the allegation in Paragraph 94.

95.     Dr. Miller submitted a complaint to the DoD Inspector General, pursuant to 10 U.S.C. § 2409(b)(1). DoD IG did not make a determination that the complaint is frivolous or otherwise not subject to the statute. DoD IG did not complete an investigation in time to submit a report within 180 days. Neither DoD nor DTRA has issued an order within 210 days after the submission of Dr. Miller's complaint. Dr. Miller has thus exhausted all administrative remedies with respect to the complaint. 10 U.S.C. §2409(c)(2).

RESPONSE:  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95 and, therefore, denies the allegations.

96.     Dr. Miller is entitled to relief under 10 U.S.C. § 2409 from the damages he suffered as a result of IDA's campaign of retaliation against him.

RESPONSE:  Defendant denies the allegation in Paragraph 96.

### Third Cause of Action — FLSA Nonpayment of Earned Wages

97.     Dr. Miller incorporates and realleges all prior paragraphs herein.

RESPONSE:  Defendant incorporates by reference all of its prior factual averments, denials, and defenses.

98.     During each of the periods of his "deployments" to Iraq, IDA paid Dr. Miller at an hourly rate of pay. IDA paid Dr. Miller only for 40 hours per week during these periods.

RESPONSE:  Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.

99.     Dr. Miller worked on average 70 hours per week during these periods. IDA knew this.

RESPONSE:  Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.

100.    IDA paid other employees working overseas for all hours worked.

RESPONSE:  Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.

101.    IDA violated the FLSA by failing to pay Dr. Miller for all of his hours worked.

RESPONSE:  Defendant refers the Court to the Partial Motion to Dismiss submitted with this Answer and Defenses to Plaintiff's Complaint.

### Fourth Cause of Action — Wrongful Discharge in Violation of Public Policy

102.    Dr. Miller incorporates and realleges all prior paragraphs herein.

RESPONSE:   Defendant incorporates by reference all of its prior factual averments, denials, and defenses.

103.    By reporting the waste and misuse of DoD funds by IDA, Dr. Miller exercised his rights to attempt to bring concerns regarding the expenditure of public funds to the appropriate officials.

RESPONSE:  Defendant denies the allegations in Paragraph 103.

104.    IDA discharged Dr. Miller because he exercised his rights to address matters of public concern.

RESPONSE:  Defendant denies the allegation in Paragraph 104.

Fifth Cause of Action — Termination for Lawful Off-Duty Activity, C.R.S. § 24 34-402.5

105.    Dr. Miller incorporates and realleges all prior paragraphs herein.

RESPONSE:   Defendant incorporates by reference all of its prior factual averments, denials, and defenses.

106.    By writing the article published in The American Interest, Dr. Miller engaged in lawful activity off the premises of the employer during nonworking hours.

RESPONSE:  Paragraph 106 is a legal conclusion, to which no response is required. To the extent that a response may be required, Defendant denies the allegations in Paragraph 106.

107.    IDA terminated Dr. Miller's employment because of his lawful off-duty activity.

RESPONSE:  Paragraph 107 is a legal conclusion, to which no response is required. To the extent that a response may be required, Defendant denies the allegations in Paragraph 107.

Sixth Cause of Action — Unlawful Prevention of Employees' Political Participation, C. R. S. § 8-2-108.

108. Dr. Miller incorporates and realleges all prior paragraphs herein.

RESPONSE:   Defendant incorporates by reference all of its prior factual averments, denials, and defenses.

109.    Dr. Miller sought prior approval from IDA to write a letter to the editor of the Wall Street Journal supporting former Senator Hagel's nomination to Secretary of Defense.

RESPONSE:  Defendant admits the allegations in Paragraph 109.

110.    IDA denied permission for Dr. Miller to submit this letter.

RESPONSE:  Defendant admits the allegations in Paragraph 110.

111.    IDA thereby prevented Dr. Miller from engaging his lawful right to political participation.

RESPONSE:   Paragraph 111 is a legal conclusion, to which no response is required. To the extent that a response may be required, IDA denies the allegations in Paragraph 111.

## PRAYER FOR RELIEF

Defendant denies that Plaintiff is entitled to any of the relief requested in the REQUESTED RELIEF clause (including subparagraphs 1-5 with respect to each Count) and denies that any liability exists against the Defendant.

## DEFENSES AND AFFIRMATIVE DEFENSES

1.     To the extent the complaint, in whole or in part, fails to state a claim for which relief may be granted, it should be dismissed.

2.     Plaintiff's claims for damages may be barred, in whole or in part, by his failure to mitigate his damages.

3.     Plaintiff's employment was terminable at the will of either party, with or without cause, and without prior notice.

4.     To the extent any of Plaintiff's claims were filed outside the applicable statute of

limitations, they are barred.

5.      Any claims for which Plaintiff failed to exhaust his administrative remedies are barred.

6.      Plaintiff's claims may be barred to the extent he alleges conduct that was not previously alleged in a timely filed administrative charge or that otherwise exceeded the scope of the charge he filed.

7.      Plaintiff's claims may be barred, in whole or in part, by the after-acquired evidence doctrine.

8.      Plaintiff's claims are barred, in whole or in part, because Defendant exercised reasonable care to prevent and correct any unlawful behavior.

9.      Plaintiff's claims are barred to the extent Plaintiff failed to take advantage of preventative or corrective opportunities provided by Defendant's policies and practices, or to avoid harm otherwise.

10.     Any injuries or damages Plaintiff suffered were due to his own acts or omissions, or the acts or omissions of others, and not Defendant's.

11.     Plaintiff's claims for monetary relief may be barred, reduced, or otherwise limited by law.

12.     Defendant's actions regarding Plaintiff were based on legitimate, business-related, non-retaliatory reasons, were not contrary to any public policy, and were not unlawful.

13.     Defendant acted, at all times, toward Plaintiff in good faith, and likewise acted in good faith in its efforts to comply with applicable law, thus barring Plaintiff's claims for punitive damages.

14.     Defendant would have made the same decisions with respect to the Plaintiff regardless of any unlawful motive.

15.     Plaintiff's claims may be barred in whole or in part because the actions of which he complains are not in all instances legally adverse actions.

16.     Plaintiff's claim for termination for lawful off-duty activity is barred as any restriction was related to a bona fide occupational requirement, was rationally related to Plaintiff's employment responsibilities, and was necessary to avoid the appearance of a conflict of interest.

17. Defendant acted in good faith and in accordance with its honestly-held business judgment and has not violated any rights which may be secured to Plaintiff under any federal, state, or local laws, rules, regulations, or guidelines.

18.     Plaintiff's damages may be limited by C.R.S. § 7-123-105.

19.     Any special damages Plaintiff seeks that he has not pled with specificity are barred.

20.     The amount of damages recoverable by Plaintiff, if any, is limited by statute.

Defendant reserves the right to amend and supplement these defenses as may appear applicable during the course of this litigation.

21.     To the extent, Plaintiff alleges a claim under the False Claims Act, that claim is barred because Plaintiff is not represented by counsel.

WHEREFORE, Defendant asks the Court to enter an award in Defendant's favor, dismiss Plaintiff's Complaint with prejudice, and award Defendant its costs, reasonable attorneys' fees, and other costs allowable by law, and whatever additional relief the Court deems just and proper.

Respectfully submitted this 30th day of January, 2018.

*s/ Timothy M. Kratz*
Timothy M. Kratz
Melisa H. Panagakos
JACKSON LEWIS P.C.
950 17th Street, Suite 2600
Denver, Colorado 80202
Telephone: (303) 892-0404
Facsimile: (303) 892-5575
Tim.Kratz@jacksonlewis.com
Melisa.Panagakos@jacksonlewis.com

*ATTORNEYS FOR DEFENDANT*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30th day of January, 2018, a true and correct copy of the foregoing **DEFENDANT'S ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT** was served via U.S. Regular Mail on the following:

*PRO SE PLAINTIFF*

Drew Miller
1855 Smoke Ridge Drive
Colorado Springs, CO 80919

*s/ AuCamya M. Parish*
for Jackson Lewis P.C.