# EXHIBIT B

Jan 22, 2017

Dr. David S. C. Chu
President, IDA
4850 Mark Center Dr
Alexandria, VA 22311

Dr. Chu:

Because I have admired you since working for you in PA&E, and again at IDA, and because I still believe in the important mission of IDA, I am writing to inform you of illegal and improper practices at IDA. I was mistreated at IDA in retaliation for objecting to Dr. Grotte's misuse of DTRA funds, and on January 18, wrongfully terminated. With this letter to you I am offering a settlement to avoid a lawsuit, DoD IG investigations, and damage to IDA's reputation.

Violations of Law

I was wrongfully terminated, fired for illegal reasons, including retaliation for my whistle blowing and lodging a complaint over Dr. Jeff Grotte's misuse of DTRA task funds, violation of my constitutional right to free speech on several occasions, and discrimination in pay and equal treatment. While IDA employees working overseas in the DIRI program get paid for all their hours worked, I was only paid for 40 of my 70 hours a week in Iraq during my four deployed analyst tours of duty for IDA.

Retaliation for objecting to Dr. Jeff Grotte's misuse of DTRA Task Funds

In 2013 I worked a Chem-Bio campaign operational risk assessment task for Jeff Grotte that received repeated praise from Chem Bio Defense Program sponsors. In Fall 2013, when funding was lost for an unrelated Chem Bio health task, people were shifted to my task. I objected to having largely inexperienced junior analysts (many with no military or military analysis experience, just health care background) on this task, and their assignment to work on a series of papers that did not support the campaign analysis and operational risk assessment task work. Dr. Grotte not only ignored my complaint, but began retaliatory treatment against me. In Nov 2013, there was a cease work order on operational risk assessment task work, with Jeff Grotte shifting ever analyst involved to other task work he controlled—except me. This was very blatant retaliation for my objections to misusing DTRA task funds. A CRP was later approved by Mike Dominguez to help cover my time, but then Jeff Grotte directed that the bulk of these hours go to a junior analyst. The paper produced was primarily my work, Mike Niles secondly—but 60% of CRP funds were directed and charged to a junior analyst per Jeff Grotte, one of "his" favored analysts he was "covering." I had to take leave for non-covered hours while looking for work in other areas of IDA, and then moved out of Dr. Grotte's Chem-Bio Defense team since as another IDA RSM put it, I was "persona non-Grotte" for daring to disagree with his absolute authority and control. I sent a memo to the SFRD

Dr. Drew Miller, Col, USAFR (Ret)    1855 Smoke Ridge Dr, Colorado Springs, CO 80919
drmiller@drewmiller.com    402-952-5339                                                        1

Division Director complaining about both Dr. Grotte's misuse of Chem Bio Defense Program funds (violation of IDA practice 1-01), the 3250 "slush fund" controlled by Grotte and Jerry Glasow at DTRA, a former IDA employee who worked for Dr. Grotte, remains a close friend, and hopes to replace Dr. Grotte at IDA when he retires.

Many IDA associates warned me that I could only lose a disagreement with Dr. Grotte given his personal control of the 3250 fund with DTRA and several million dollars of additional Chem-Bio research funds. It is clear from several events, that Dr. Grotte is allowed to violate IDA policies, including misuse of sponsor task funds, and retaliate against other employees who do not bring in the funds he does. He is well known for his independence and power in running and controlling his "empire" of chem-bio research funds. The series of retaliations by Dr. Grotte for my objection to his misuse of DTRA task funds continued and ultimately ruined my career at IDA and led to my termination on Jan 18, 2017.

In 2014 I prepared an article on "The Age of Bioengineered Viral Pandemics and Collapse," based on my private research over the past several years, and absolutely no IDA task work. Dr. Grotte did not want my article published. Because of the IDA requirement of review and approval of personally written articles, the paper and article were reviewed and revised many times. Another SFRD Asst Div Director reviewed and liked it, and after half a year of delay, it ultimately met Mike Dominguez's approval for meeting IDA standards, an IDA publication number was put on it, it was submitted to Mr. Major, and approved for release as NSD-5335.

In Dec 2014, I emailed my Div Dir requesting approval to present at an upcoming CBRN conference on "Psychological and social effect of CBRN events" and was directed to find a government sponsor for the presentation. In early 2015, via Alec Wahlman, the National Guard Bureau agreed to be a sponsor. They liked my presentation topic, and Alec requested that I also do a short paper/study under his task on this topic due to high NGB J8 interest. His budget was very limited, and he could only authorize 10 hours of IDA work, but I agreed to volunteer my own time to prepare the paper. In March 2015, Mike Dominguez assigned Jeff Grotte and Bob Zirkle to review the draft NGB paper I prepared (largely on my own time). On April 28, 2015, I was told by my Div Dir that my NGB paper had been condemned by reviewers and that my involvement with "Fortitude Ranch" (a prepper/recreational community) could constitute a conflict of interest (I disagreed—no relationship with DoD or government). My May 2015 Performance Review evaluation praised the "article based on Dr. Miller's personal interest and self-initiated research into the bioengineered viral pandemic threat was approved as an IDA document and has been submitted for publication." I was given a raise and bonus.

But on June 10, 2015, because of Dr. Grotte's retaliation and continued efforts to punish me, I received an email from Phil Major notifying me of an investigation of scientific misconduct. Per the Draft of Findings enclosed, Dr. Grotte was the person who initiated the Code of Conduct complaint against me. He also researched, wrote and submitted subsequent memos to the investigative committee attacking me.

The details of this retaliation, personal attacks, and abuse by Dr. Grotte are evident in the draft inquiry report and my reply to it (both documents enclosed). My reply to accusations in the draft inquiry report reference numbers in the inquiry report.

Not only was Dr. Grotte's accusation that I stole IDA work and attempted to publish for personal financial gain untrue, but it was IDA who took my private research and appropriated it into IDA labeled publications in the course of IDA review and approval required for outside, personal work. The wrongful taking was by IDA, not me.

Jeff Grotte and an associate who often works with him leveled dozens of bogus charges of not just scientific misconduct, but personal insults, charges of racism, stealing, plagiarism, political incorrectness and character attacks. The charges Dr. Grotte leveled against me, and the fact that they were found to be false, is overwhelming evidence of his illegal vendetta against me for daring to protest his misuse of DTRA task funds.

While I was cleared of these charges and defaming accusations by Dr. Grotte, it was a humiliating, very upsetting, and very damaging summer while the investigation proceeded and I waited for the results (never even allowed to see what the final report said). The involvement of assistant division directors from three other divisions, plus being pulled from work with task leaders in other divisions, effectively ruined my career at IDA. IDA became a hostile, unpleasant place to work. I thus decided to leave full time work at IDA and transitioned to offsite adjunct status.

Unconstitutional, illegal suppression of my right to free speech

A request to write a letter to the editor (Wall Street Journal) supporting Senator Hagel (my home state, know him well, friend) during his brutal SecDef confirmation process, with no mention of IDA, was denied--a violation of my Constitutional right to free speech.

I have never done any IDA work on bioterrorism or bioengineering. The work I've done on bioengineered pandemics over the past decade has been on my own time with public resources—documented through public presentations on the topic. Despite proving this in the investigation, a March 7, 2016 IDA Memo cited violation of IDA Practice 5-10 banning "release to the public materials generated through IDA research." I have never done this, and the Fall 2016 article I published (copy enclosed) that led to my termination also contains nothing from IDA work (nor is any mention made of my affiliation with IDA). The memo banned me to do any private research or writing on this topic--clearly written to assuage Dr. Grotte. The fact that my article was accepted for publication in a highly respected public policy journal, *The American Interest*, attests to its value and worth.

First Amendment protection of speech that addresses a matter of public concern certainly applies to warning the public about bioengineered viral pandemics, arguably the worst threat we face, likely more devastating than even a major nuclear attack. As many experts cited warn, it is an existential threat, capable of wiping out humanity. IDA's opposition to me publishing on this threat stems from Dr. Grotte's vendetta and retaliation.

IDA terminated me for my article on bioengineered pandemics, censored due to Dr. Grotte's vendetta against me for objecting to his misuse of DTRA funds. If Jeff Grotte had published this article, IDA would have praised this. But since I published it, I was fired.

3

I served as an intelligence officer in the military, and have a long-standing devotion to warning of grave security threats. It was my right and moral obligation to publish warnings of the bioengineered pandemic threat based on my private research, under my name, with no mention of IDA.

Discriminatory Pay for Overseas Work

When IDA needed volunteers to work in Iraq as deployed analyst, I answered the call four times and served for a year overseas during Operation Enduring Freedom, in Baghdad and several operational bases. I met a former IDA employee in Iraq who had left IDA to work with another contractor because they paid for all hours worked. Recently I learned that IDA does pay deployed analysts serving overseas for all hours worked, well beyond 40/week. The IDA Defense Institution Reform Initiative (DIRI) program pays deployed IDA analysts for all their hours worked. Because of the abuse I suffered from Dr. Grotte's retaliation and discriminatory application of IDA policies, I am now demanding pay for my unpaid hours. I worked well over 70 hours/week in Iraq (worked every day, no exceptions), but was paid for just 40. For my service in Iraq this amounts to at least $100,000. This does not include any extra for over time or holiday pay, just my normal hourly rate. With the lost investment earnings on this unpaid income, the total value is $162,000.

Proposed Settlement

I remain a big fan of IDA, believe in its mission, and like 99% of the people who work at IDA. I would thus prefer to settle this without IG investigations, court action, and bad publicity for IDA (though this could help warn the public about the bioengineered pandemic threat). If I must engage my attorney there will be greater expense to both of us. There are some additional issues and compensation beyond items listed here that we will pursue if this proceeds to court.

In exchange for $350,000 as compensation for illegal mistreatment, irreparable career damage and termination, and unpaid work hours, I will agree to the following:

1. Dr. Miller will not file any complaint with the DoD IG or DTRA over Dr. Grotte's misuse of DTRA task funds.
2. Dr. Miller agrees not to file a lawsuit for wrongful termination or any other issues related to work at IDA
3. No claim for compensation for unpaid hours worked in Iraq as a deployed IDA Analyst will be filed.
4. Dr. Miller will not cite or blame IDA for delays in publicizing information on the bioengineered viral pandemic threat, or publicly criticize IDA mistreatment.

If you would like to work out a settlement with me, please let me know by Feb 28 or I will sign the paperwork authorizing my attorney to proceed and file DoD IG complaints for both misuse of DTRA funds (fraud, waste and abuse complaint) and reprisal for whistleblowing.

*[signature: Drew Miller]*