# EXHIBIT C



Benjamin R. Lindorf
General Counsel

February 24, 2017

**VIA ELECTRONIC DELIVERY**
Randolph R. Stone
Deputy Inspector General for Policy and Oversight
Office of the Inspector General
Department of Defense
4800 Mark Center Drive
Alexandria, VA 22350-1500
disclosures@dodig.mil

      **Subject:**      **Notice of Attempted Extortion by Former IDA Employee Involving Spurious Allegations of Misuse of Task Funds and Reprisal for Whistleblowing**

      **Reference:**      **Contract HQ0034-13-R-0092 (Contracting Officer Stas Blaushild, Washington Headquarters Services Acquisition Directorate (WHS/AD), 1225 South Clark Street, Suite 900, Arlington, VA 22202, 703-545-3501)**

Dear Mr. Stone:

The purpose of this letter is to make you aware of an attempt by a former employee, Dr. Drew Miller, of the Institute for Defense Analyses (IDA or the Company) to extort a significant settlement from IDA by threatening to report IDA to the DoD Inspector General unless his settlement demands are met. Specifically, in a letter dated January 22, 2017,[1] Dr. Miller claimed that he reported concerns about the misuse of contract funds to IDA management in April of 2014, and that he was subjected to various retaliatory actions as a result of submitting this report that culminated in the termination of his employment on January 18, 2017. Dr. Miller has threatened that unless IDA pays him $350,000 to settle his various claims against the Company, he will file an IG complaint for fraud, waste, and abuse and for reprisal for whistleblowing.

As explained below, IDA has conducted a thorough investigation into the claims made by Dr. Miller, and has concluded that there is no basis to his allegations. However, because we believe that Dr. Miller is using the threat of an IG complaint in an inappropriate and extortionate manner, we wanted to bring his claims to the attention of the IG ourselves, along with a brief summary of our findings regarding his claims.

While this submission contains the details of IDA's investigation and provides, we believe, a sufficient basis for the IG to determine that Dr. Miller's claims lack merit, IDA would be happy to provide your office with any additional information that would be helpful.

---

[1]     A copy of this letter is included at Exhibit A.

## I. BACKGROUND

### A. IDA Overview

IDA is a non-profit corporation organized under a government mandate and operating in the public interest. It manages three federally funded research and development centers (FFRDCs) that provide objective analyses of national security issues and related national challenges, particularly those requiring exceptional scientific and technical expertise. The above-referenced FFRDC contract is sponsored by the Department of Defense.

### B. Dr. Miller's Employment History

#### 1. Employment Classification

Dr. Miller began his employment at IDA in 2003 as a consultant, before transitioning to an adjunct employee in 2006. IDA's adjunct employees work on a part-time, as-needed, hourly basis, and are considered non-exempt from federal wage and hour requirements under the Fair Labor Standards Act (FLSA). IDA hired Dr. Miller as an adjunct employee (rather than a full-time employee) because he lived in Colorado, well outside of the Washington, D.C. metro area, where IDA's headquarters is located,[2] and because IDA did not anticipate that Dr. Miller would be consistently working on a full-time basis.

In December 2006, IDA converted Dr. Miller's employment to a full-time, FLSA-exempt status prior to an IDA assignment to work in Iraq for a 90-day period, a position which required a full-time IDA analyst. This conversion to an exempt employee status was consistent with IDA policy and Dr. Miller's full-time duties in Iraq, and was also necessary to provide Dr. Miller with "danger pay" and other employee benefits for which adjunct employees were not eligible. Dr. Miller completed a total of 4 such assignments in Iraq working on IDA projects, and each time was converted to an FLSA-exempt employee status for the duration of the assignment; each time he returned to the United States, he was converted back to a non-exempt adjunct employee status because of the expectation that he would not be working full-time and because he continued to live in Colorado.

When Dr. Miller moved to the D.C. Metropolitan area in 2012, he asked to be converted to a full-time, FLSA-exempt employee status on a permanent basis, and his request was approved on May 13, 2012. He remained in this status until February 26, 2016, when he requested that he be converted back to adjunct status so that he could move back to Colorado.

---

[2]   Because IDA maintains a work environment that is collaborative in nature, IDA does not permit its full-time employees to telecommute from a remote location.

2. Conflict of Interest

On April 27, 2015, Mike Dominguez, division director for IDA's Strategy, Forces and Resources Division (SFRD), reported a potential conflict of interest involving Dr. Miller's apparent management/ownership role in a start-up disaster preparation organization called Fortitude Ranch. That organization planned to deal in a subject matter (disaster preparation, global pandemics, etc.) that overlapped with portions of IDA's work in general, and some of Dr. Miller's work at IDA in particular. Mr. Dominguez also reported that Dr. Miller may have been using work produced by IDA to further this business interest, as evidenced by an uncredited table of data from one of Dr. Miller's IDA publications which was discovered in a publication issued by Fortitude Ranch.

Once Dr. Miller's interests in Fortitude Ranch were confirmed, Mr. Dominguez instructed Dr. Miller that he must cease involvement in IDA research related to biological pandemics and subsequent societal turbulence, and to cease writing and speaking in public on this topic so long as he had an interest in Fortitude Ranch. Mr. Dominguez also counseled Dr. Miller on the application of IDA's policies regarding conflicts of interest and the need to disclose all outside business affiliations. Dr. Miller agreed to withdraw himself from the Fortitude Ranch organization and to comply with IDA's conflict of interest policies going forward.[3]

3. Scientific Misconduct Investigation

On April 29, 2015, Jeff Grotte, a deputy director for SFRD, reported possible instances of plagiarism and scientific misconduct by Dr. Miller in a draft IDA report that Dr. Miller had authored for a National Guard sponsor entitled "Possible Consequences of a Collapse in Economic Activity and Law and Order after a Viral Pandemic, and Options for DoD to Improve Response Capability." IDA requires that all IDA reports pass through a rigorous peer review process before being approved for submission to the report's sponsor. In this case, the peer reviewers had identified several instances of apparent inaccuracies in quoted materials and possible incidents of plagiarism. As an IDA supervisor, Dr. Grotte was required under IDA's code of conduct to report this matter to IDA's Office of General Counsel (OGC). Consistent with IDA practices regarding this type of "scientific misconduct," OGC notified Phil Major, IDA's Vice President of Programs, about the alleged misconduct; Dr. Miller was informed of the allegations made against him on June 5, 2015, and Mr. Major convened a formal investigation panel (consisting of three senior researchers from across the organization) on June 11, 2015.

The panel's formal investigation largely substantiated the original allegations made against Dr. Miller.[4] A draft report of the findings was given to Dr. Miller and he was allowed to provide a

---

[3] Because Fortitude Ranch was still in the early stages of business development at the time, and because it did not have any business dealings with IDA sponsors, IDA determined that Dr. Miller's actions (while still in violation of IDA's conflict of interest policies) created only a perception of a conflict of interest, rather than an actual conflict of interest.

[4] As a result of these findings, IDA held back the National Guard report, and reversed $2,175.00 in charges associated with Dr. Miller's work on the report. We confirmed in our investigation that Dr. Miller had not

rebuttal. After considering his responses, the panel prepared a final report which concluded that Dr. Miller's draft paper was not written in an objective manner and failed to meet IDA standards of quality and scientific integrity. Mr. Major delivered a memorandum based on the investigation panel's report to IDA President Dr. David Chu on October 30, 2015, with recommendations from the panel that Dr. Miller receive a letter of counseling and that his performance on other projects be monitored for similar problems.[5] The memo also contained the panel's recommendation that Dr. Miller continue to be barred from undertaking any research on the topics at issue in the National Guard report, either on IDA time or his own time, as a condition of his ongoing IDA employment.

    4.   Formal Counseling and Termination of Employment

Dr. Miller was provided with a letter of counseling, a copy of which was also placed in his employee file, on March 7, 2016.[6] The letter discussed the conflict of interest and the scientific misconduct investigations and their conclusions, noting specifically that he had failed to report a conflict of interest and that his paper lacked objectivity and did not meet IDA's standards for research quality and integrity. It also stated that Dr. Miller had been instructed to cease involvement in research on topics related to pandemics and to stop writing and speaking on the subject while he remained an IDA employee. Dr. Miller's 2015 performance review also discussed these investigations and their negative impact on Dr. Miller's work for that period.[7] This review restated the conclusions of the scientific misconduct investigation, his failure to report a conflict of interest, and the continuation of the prohibition on professional activities involving biologic pandemics.

On January 12, 2017, IDA became aware that Dr. Miller had published an article in the September 2016 issue of *The American Interest* magazine entitled "The Age of Designer Plagues".[8] This article directly violated the terms of his March 2016 letter of counseling, as the article directly covered the subjects of biological pandemics and subsequent societal turbulence which were specifically prohibited in that letter. As a result of this finding, and his history of other associated performance concerns, IDA terminated Dr. Miller's employment on January 18, 2017.

---

    engaged in any other sponsored work on the topic of global pandemic events, and that no other similar concerns had been raised regarding Dr. Miller's earlier IDA work on other subjects.
[5] A copy of this report is provided at Exhibit B.
[6] A copy of this letter is provided at Exhibit C.
[7] A copy of this performance review is provided at Exhibit D.
[8] A copy of this article is provided at Exhibit E.

## II.   ALLEGATIONS REGARDING MISUSE OF CONTRACT FUNDS

### A.  Summary of Dr. Miller's Allegations

In Dr. Miller's January 22, 2017 letter to IDA, he alleged that he complained directly to Dr. Grotte in the Fall of 2013 about Dr. Grotte's alleged misuse of contract funds, and also filed a formal complaint with Mr. Dominguez in a memorandum on April 9, 2014.[9]

In his January 2017 letter, Dr. Miller gave only one example of how Dr. Grotte allegedly misused DTRA funds.  He described an instance in which Dr. Grotte shifted "largely inexperienced junior analysts (many with no military or military analysis experience, just health care background)" to work on a portion of a Dr. Grotte-led project for which Dr. Miller did not feel that they were suited.  Dr. Miller indicated that these "junior analysts" were assigned to work on "a series of papers that did not support the campaign analysis and operational risk assessment task work."

### B.  Results of IDA Investigation

Dr. Miller's current characterization of his April 9, 2014 memorandum is not accurate.  The memorandum was actually written as a response to his 2013 performance review, which identified a number of significant shortcomings in Dr. Miller's work on a particular project.[10] Dr. Miller was removed from this project by Dr. Grotte because of lackluster performance and Dr. Miller's inability to finish a paper of satisfactory analysis and quality.  The April 2014 memorandum merely gives Dr. Miller's perspective on why his work on this deliverable did not meet expectations; he blamed his 2013 performance shortcomings on Dr. Grotte's decision to reorganize the project and reassign staff in a manner that undermined what Dr. Miller saw as the primary objective of the project.

The April 2014 memorandum detailed Dr. Miller's various disagreements with Dr. Grotte's management style and his exercise of discretion, and objected to the way in which Dr. Miller's contributions on the various aspects of the project were characterized, but it did not claim at any point that Dr. Grotte actually engaged in a misuse of contract funds.  Dr. Miller even closed the memorandum by emphasizing: "I do not want to create any trouble for [Dr. Grotte] or IDA, I am submitting this to justify changes to my performance evaluation."  Accordingly, our investigation determined that Mr. Dominguez took Dr. Miller's memorandum at face value when he received it, and determined that no change in his evaluation was warranted as a result of the information provided in the memorandum.

Our investigation confirmed the reasonability of Mr. Dominguez' approach to Dr. Miller's expressed concerns.  Dr. Miller was given responsibility over a particular aspect of a much larger project, but he was not a "task lead" with broad project oversight and control (as he insinuates in

---

[9]   A copy of this memorandum is provided at Exhibit F.
[10]  A copy of this performance review is provided at Exhibit G.

4850 Mark Center Drive • Alexandria, Virginia 22311-1882
703.845.2000 • www.ida.org

both the January 2017 letter and the April 2014 memorandum).  This broad oversight and control was exercised exclusively by Dr. Grotte, who was managing a team of more than 30 researchers on a variety of coordinated efforts under this project.  Dr. Miller only had visibility into a small part of the overall project scope, did not interact directly with the sponsor on a consistent basis, and both his April 2014 feedback on his 2013 performance review and his January 2017 letter reflect this relatively narrow perspective.

Our investigation also concluded that Dr. Grotte's actions to reorganize certain aspects of the project were intended to more effectively address the long-term needs of the project sponsor.  Dr. Grotte, as the longtime project leader, was in a better position to assess these needs than was Dr. Miller, whose involvement in the project was both limited and short-term.  Furthermore, Dr. Grotte's decision to assign "junior" analysts with a different base of expertise than that held by Dr. Miller to work on this deliverable was intended to help bridge deficits in Dr. Miller's abilities; Dr. Grotte believed that the involvement of these "junior" researchers would improve the overall quality of the deliverable by incorporating their significant technical expertise into the analytical framework Dr. Miller was developing.

In summary, while Dr. Miller may have drawn different conclusions from Dr. Grotte's actions, based on his limited experience with the project and his narrow perspective on its overall scope, our investigation validated the premise that Dr. Grotte's actions fell within the spectrum of overall discretion that IDA gives to all project leaders.  As such, we have concluded that Dr. Grotte's actions in this regard did not constitute a misuse of contract funds or fraud, waste, and abuse as alleged by Dr. Miller.

### III. ALLEGATIONS REGARDING RETALIATION FOR WHISTLEBLOWING

#### A. Summary of Dr. Miller's Allegations

In Dr. Miller's January 22, 2017 letter to IDA, he also alleges that the events leading to his termination, as described above, were in direct retaliation for complaints that Dr. Miller made to Dr. Grotte in the Fall of 2013, and for complaints that Dr. Miller made to Mr. Dominguez in his April 2014 memorandum.  Specifically, Dr. Miller alleges that he was excluded from projects because of his disagreements with Dr. Grotte, that Dr. Grotte orchestrated the investigations into scientific misconduct and conflicts of interest involving Dr. Miller's work as punishment for his disagreements with Dr. Grotte, and that the restrictions on publication that led to Dr. Miller's termination from IDA were implemented as part of Dr. Grotte's "illegal vendetta" against Dr. Miller.

#### B. Results of IDA Investigation

Our investigation confirmed that Dr. Miller was excluded from other projects managed by Dr. Grotte after Dr. Grotte ordered Dr. Miller to stop the operational risk assessment task work on which Dr. Miller had been spending the bulk of his time.  However, we determined that this exclusion was based on factors reasonably associated with the needs of the overall project, and

not on any unlawful animus by Dr. Grotte. Dr. Miller's accusation ignores the fact that the cease work order on this project came because Dr. Grotte and Mr. Dominguez determined, after working with Dr. Miller on multiple drafts, that Dr. Miller's skills and abilities were unequal to the task of completing a deliverable of sufficient quality and analytical rigor to be useful to the sponsor. At the time the decision was made to cease work on the deliverable, its completion was already so delayed that the opportunity to offer relevant and timely guidance to the sponsor had already passed. In the wake of Dr. Miller's serious performance failures, it was reasonable for Dr. Grotte to determine that he did not want Dr. Miller working on other aspects of this project. As a secondary note, Dr. Miller's expertise in the area of risk-based decision making was not relevant to these other facets of Dr. Grotte's project, which required more conventional technical backgrounds and experience in quantitative analysis that Dr. Miller lacked. As a result, it was reasonable and appropriate for Dr. Grotte to exclude Dr. Miller from this work, and there is no indication that this exclusion was intended to be retaliatory.

In addition, as detailed above, Dr. Miller was found to have violated IDA's conflicts of interest policies, to have engaged in scientific misconduct,[11] and to have violated the terms of his letter of counseling. While our investigation confirmed that Dr. Grotte was involved in raising these issues to the attention of IDA management, we also confirmed that Dr. Grotte served as the deputy director of SFRD at all times in which this conduct occurred. As a member of SFRD management, Dr. Grotte was responsible for working closely with Mr. Dominguez on any issues involving employee misconduct within the division. In addition, because Dr. Grotte's subject matter responsibilities within SFRD included research on global pandemics and the resulting emergency management and security implications, Dr. Miller's misconduct was particularly relevant to Dr. Grotte's professional obligations; Dr. Grotte was acting in a manner consistent with IDA's expectations by identifying misconduct that tied directly to IDA's work in the subject matter areas over which Dr. Grotte was responsible. If Dr. Grotte had not reported Dr. Miller's misconduct, Dr. Grotte would have been subject to disciplinary action for failing to properly exercise his management duties.

### IV. OTHER UNRELATED ALLEGATIONS RAISED IN DR. MILLER'S LETTER

#### A. Suppression of Right to Free Speech

In his January 2017 letter, Dr. Miller alleged that IDA suppressed his "right" to free speech[12] when Mr. Dominguez prohibited him from writing a letter to the editor for publication in The Wall Street Journal in support of Senator Chuck Hagel during the Senator's 2013 confirmation

---

[11] Dr. Miller states in his January 2017 letter that the charges of scientific misconduct were ultimately found to be false. We have no explanation for how he came to this conclusion. Dr. Miller was informed multiple times that his actions constituted scientific misconduct (even if some of the particular sub-elements of the original allegations were ultimately not confirmed).

[12] We note that the Constitutional protections afforded by the First Amendment apply only to Government actors; the Constitution does not prohibit private employers from limiting the speech of their employees as a condition of maintaining their employment.

hearings to become the Secretary of Defense. Dr. Miller was not allowed to publish this letter while he remained an IDA employee because of its political nature and because IDA's primary government sponsor is the Office of the Secretary of Defense. Such a publication would run counter to IDA's need to remain objective and unbiased in its support of its government sponsors.

Dr. Miller also alleged that IDA suppressed his rights by terminating his employment after discovering that he had published his September 2016 article on bioengineered pandemics. As discussed above, as a result of Dr. Miller's significant misconduct, IDA placed limitations on his ability to publish in the area of global pandemics as a condition of his ongoing employment. When IDA discovered that this condition had been breached, Dr. Miller's employment was terminated.  If Dr. Miller had instead resigned his employment, IDA would have had no basis for limiting his ability to engage in outside publications on any subject of his choosing; as a result, Dr. Miller was technically free at all times to publish as he desired.

### B. Discriminatory Pay for Overseas Work

Dr. Miller alleged that IDA did not properly compensate him while he was deployed in Iraq as an analyst for IDA. As discussed above, at the time in question Dr. Miller lived in Colorado and accordingly was an adjunct employee – classified as non-exempt under the FLSA.  In this status, he was paid on an hourly basis for all hours worked and was eligible for overtime pay in the course of his normal duties.  However, as an adjunct employee he was not eligible for employee benefits, including evacuation services, international medical coverage, and "danger pay" which IDA determined were necessary for all employees engaged in long-term assignments in Iraq.  In addition, while he was not expected to work on a full-time basis as an adjunct employee in Colorado, he was expected to work on a full-time basis while in Iraq.  Therefore, IDA's standard practice at the time was to convert all adjunct employees assigned to Iraq to full-time, benefits eligible, FLSA-exempt status.[13]  In that status, Dr. Miller was paid on a weekly salaried basis, rather than an hourly basis, regardless of how many hours he worked in a particular week.  Our investigation confirmed that this policy was applied uniformly to all adjunct employees assigned to work in Iraq, and was consistent with the requirements of the FLSA.

In contrast, adjunct employees currently assigned to work as program analysts on IDA's Defense Institution Reform Initiative (DIRI) travel overseas inconsistently and for significantly shorter periods of time (usually for 1-3 weeks per trip).  In addition, these adjunct employees are not deployed to war zones where benefits like "danger pay" would normally be provided.  Although our investigation confirmed that the FLSA would permit IDA to also re-classify these employees to full-time, FLSA-exempt status on the weeks in which they are working abroad on DIRI programs, IDA has made an internal policy decision that this process would be unnecessarily burdensome and would create additional compliance risks.

---

[13] Please note that IDA has not deployed analysts to Iraq for a number of years.  For that reason, this account describes IDA's standard practices as they existed at the time IDA was actively involved in such deployments, and does not necessarily reflect how IDA would handle similar deployments at the present time.

## V. CONCLUSION

IDA undertakes to provide a productive, collaborative, and engaging work environment that is free from the type of misconduct that has been alleged by Dr. Miller. However, IDA does not permit employees to willfully disregard core policies that are intended to protect IDA's reputation and ability to engage in objective research and analysis on behalf of our government sponsors. Dr. Miller was found to have violated those policies on multiple occasions, and his employment was terminated as part of a reasonable and progressive employee disciplinary process.

If you have any further questions regarding this disclosure, please contact the undersigned at 703.578.2853 or blindorf@ida.org.

Sincerely,

Benjamin R. Lindorf
General Counsel

cc: Stas Blaushild, Contracting Officer