**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02411-NYW

DREW MILLER,

      Plaintiff,

v.

INSTITUTE FOR DEFENSE ANALYSES, *a Delaware Non-Profit Corporation*,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendant Institute for Defense Analyses' ("Defendant" or "IDA") Motion for Summary Judgment (or "Motion") [#43],[1] filed October 5, 2018. The Motion is before the undersigned pursuant to 28 U.S.C. § 636(c), D.C.COLO.LCivR 72.2, Fed. R. Civ. P. 73, and the Order of Reference for all purposes [#14]. The court concludes that oral argument will not materially assist in the resolution of this matter. Having carefully reviewed the Motion and associated briefing, the applicable case law, and the entire record, the court **GRANTS** the Motion for Summary Judgment for the reasons stated herein.

## PROCEDURAL BACKGROUND

      Plaintiff Drew Miller ("Plaintiff" or "Dr. Miller") initiated this action on October 6, 2017, asserting federal claims against IDA for: False Claims Act retaliation ("Claim 1"), Defense

---

[1] When citing to a document in the record, the court cites to the document number and page number generated by the court's Electronic Court Filing ("ECF") System. When citing to a transcript, the court cites the ECF document number but the page and line numbers generated by the transcript. And when citing to Plaintiff's exhibits [#52], the court cites the ECF document number, the exhibit number, and the page identifier, if any, in the bottom right corner of the document.

Contractor Whistleblower Protection Act retaliation ("Claim 2"), and non-payment of earned wages under the Fair Labor Standards Act ("FLSA") ("Claim 3"); as well as state law claims for: wrongful discharge in violation of public policy ("Claim 4"), termination for lawful off-duty activity ("Claim 5"), and unlawful prevention of an employee's political participation ("Claim 6"). *See generally* [#1]. The court granted Defendant's Partial Motion to Dismiss and dismissed Claim 3, and Plaintiff did not seek leave to further amend Claim 3 despite an opportunity to do so. *See* [#34; #35].

Defendant now moves for summary judgment on Plaintiff's remaining claims. *See* [#43]. Plaintiff filed his Response in opposition to the Motion, but agrees to dismiss Claim 4 as preempted by the False Claims Act, *see* [#50 at 1],[2] and IDA has since filed its Reply, *see* [#61].[3] The Motion is now ripe for disposition, and I consider the Parties' arguments below.

## LEGAL STANDARD

Pursuant to Rule 56, the court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d

---

[2] For this reason, the court **DISMISSES with prejudice** Claim 5. Additionally, Plaintiff's Response appears to seek Rule 11 sanctions against IDA for "submit[ing] blatant lies in [its] MSJ," as well as leave to file a sur-reply. *See* [#50 at 30-31]. The court denies both requests, because Local Rule 7.1(d) prohibits the inclusion of such requests in a Response to a motion, *see* D.C.COLO.LCivR 7.1(d), and Dr. Miller fails substantively to provide a sufficient basis for granting either request, *cf. Hutchinson v. Pfeil*, 105 F.3d 562, 565 (10th Cir. 1997) (finding no attorney misconduct where defense counsel zealously advocated for their client "by advancing arguments and factual interpretations favorable to their clients").

[3] The court granted IDA's unopposed request to file an Amended Reply in support of its Motion for Summary Judgment, *see* [#60], and the court cites exclusively to the Amended Reply [#61].

1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted). It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). And though the court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant[,]" *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016), the nonmovant must point to competent summary judgment evidence, *see Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004), and may not rely on "mere reargument of his case or a denial of an opponent's allegation[,]" *see* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998).

In applying the applicable legal standard, the court is mindful that Dr. Miller proceeds *pro se* and therefore construes his pleadings liberally. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the court does not act as his advocate, and applies the same procedural rules and substantive law to Plaintiff as to a represented party. *See Murray v. City of Tahlequah,* 312 F.3d 1196, 1199 n.2 (10th Cir. 2008).

## ANALYSIS

### I.   Material Facts

The court draws the following material facts from the record before it. These material facts are undisputed unless otherwise noted.

1.      Dr. Miller is a retired Colonel of the United States Air Force Reserve, having served for 30 years in the military; he received a master's degree and Ph.D. in public policy; and he held several civilian jobs, including as a County Commissioner, adjunct professor, and University of Nebraska Regent, prior to joining IDA. *See* [#43-6 at 13:1-24:2; #52 at Ex. 1, ¶¶ 2-10, 15-16, 18].

2.      "IDA is a non-profit corporation organized under a government mandate and operating in the public interest," and it "manages three federally funded research and development centers that provide objective analyses of national security issues and related national challenges, particularly those requiring exceptional scientific and technical expertise."  [#43-1 at ¶ 3].

3.      Dr. Miller began working for IDA as a consultant in or around 2003, before becoming an adjunct employee (working on a part-time, as needed, and hourly basis, with no benefits) in or around 2006.  *See* [#43-1 at ¶ 4; #43-6 at 22:24-23:6, 24:22-25, 41:1-9, 50:1-51:15].

4.      In or around 2012, IDA hired Dr. Miller as a full-time employee.  *See* [#43-1 at ¶ 5; #43-6 at 51:16-23, 52:19-54:10; #52 at Ex. 1, ¶ 11].

5.      Plaintiff began specializing in "chem-bio" research, an area of interest to Dr. Miller since his time with the Air Force Academy, which involved the research and analysis of biological and chemical threats, including "black swan" threats (i.e., those people ignore because they are extremely rare).  *See* [#43-1 at ¶ 5; #43-6 at 56:14-60:5, 63:11-65:12; #52 at Ex. 1, ¶¶ 23-25].

6.      Dr. Miller's chem-bio work for IDA comported with his interest in the "prepper" community—those who believe in preparing for an economic collapse following a pandemic or natural disaster.  *See* [#43-6 at 64:25-65:2, 65:14-68:16].

7.      In or around May 2012, IDA assigned Dr. Miller to the Operational Risk Assessment Project ("ORAP"), "a subtask within the much larger '3250' task," because of Dr. Miller's military service and chem-bio interest.  [#43-1 at ¶ 5; #43-6 at 56:24-57:10, 103:19-24, 104:4-18, 180:24-181:1].

8.      Dr. Jeff Grotte ("Dr. Grotte") supervised IDA's chem-bio research, including the ORAP, the 3250 task, and 30 researchers, while Dr. Miller "was responsible for and led the day-

to-day execution of the ORAP." [#43-1 at ¶ 5]; *see also* [#43-6 at 56:24-57:10, 103:19-24, 115:5-17, 116:8-16; #52 at Ex. 1, ¶¶ 23-24].

9.      Jerry Glasow, a former IDA employee who worked for Dr. Grotte, sponsored the ORAP through the Defense Threat Reduction Agency—an agency within the Department of Defense ("DoD"), *see* [#43-6 at 110:19-111:9]; Plaintiff believed this relationship perpetuated IDA's alleged misuse of government funds and/or fraud on the United States government, *see* [*id.* at 155:8-17, 165:16-19, 182:2-8].

10.     About 2013, Dr. Miller created and began marketing memberships to Fortitude Ranch, a survival community with properties in West Virginia and Colorado. *See* [*id.* at 68:1-9, 78:18-80:22, 221:1-223:18; #52 at Ex. 1, ¶ 26].

11.     In January 2013, Division Director Michael Dominguez ("Mr. Dominguez") denied as violating IDA policy Dr. Miller's request to write a letter to the editor of the Wall Street Journal that noted Plaintiff's work with IDA and supported the nomination of then-Senator Chuck Hagel as Secretary of Defense. *See* [#43-1 at ¶ 22; #43-18; #52 at Ex. 7, IDA 000599].

12.     About September 2013, Dr. Grotte assigned six new analysts to the ORAP from another project—analysts Dr. Miller believed to be unqualified for the ORAP and whom Dr. Miller attributes the ORAP's shortcomings to. *See* [#43-1 at ¶ 7; #43-6 at 131:14-132:23, 134:4-136:24, 141:19-144:6, 180:9-182:8, 182:9-17].

13.     On several occasions, Plaintiff complained to Dr. Gotte and others at IDA about the new analysts and the purported ill-effects caused by these analysts to the ORAP; Plaintiff even requested that IDA remove him from the ORAP. *See, e.g.*, [#43-1 at ¶ 8; #43-6 at 114:17-116:7, 137:4-22, 138:1-21, 139:7-140:14, 141:7-142:1, 182:18-184:25, 217:9-219:4; #43-8 at 1-3; #52 at

Ex. 1, ¶ 29; #52 at Ex. 2, DM0034-36, DM0078; #52 at Ex. 3, IDA008422; #52 at Ex. 5, IDA015324].

14.    Indeed, other IDA employees believed the ORAP to be disorganized and unproductive, and opined that Dr. Miller's inconsistencies and lack of direction to the six new analysts was the problem.  *See* [#52 at Ex. 3, IDA003466]; *see also* [#43-6 at 153:12-154:7].

15.    By November 2013, despite the initial success of the ORAP, *see, e.g.*, [#43-6 at 111:22-114:10; #52 at Ex. 3, IDA003474-75, IDA007492, IDA007556, IDA013809], Dr. Grotte issued a cease work order on the ORAP without informing Dr. Miller of the reasons for the cease work order, *see* [#43-6 at 154:8-155:5, 155:20-156:1, 156:19-25; #52 at Ex. 3, IDA012492].

16.    Dr. Miller maintains that Dr. Grotte reassigned the six new analysts to new projects while Dr. Miller had to take leave because he did not have work; Plaintiff did not again work for Dr. Grotte.  *See* [#43-8 at 2; #52 at Ex. 2, DM0035-37; #52 at Ex. 4, DM0084, DM0504; #52 at Ex. 5, IDA015324].

17.    Issues with the ORAP and Dr. Miller's day-to-day leadership were a focal point of his 2013 performance review, *e.g.*, [#43-7 at 3], despite generally positive performance reviews from years prior, *e.g.*, [#52 at Ex. 1, ¶ 13; #50 at Ex. 6, DM0041-53].

18.    In a memorandum dated April 9, 2014, Dr. Miller responded to his 2013 performance review and largely criticized Dr. Grotte's management of the ORAP and the 3250 task while also suggesting that Dr. Grotte's negative comments were retaliation for Dr. Miller's complaints about the six new analysts.  *See* [#43-8; #52 at Ex. 2, DM0034-37]; *see also* [#43-6 at 165:9-168:22, 177:6-11, 178:12-25, 179:5-8, 180:1-18, 216:17-20].

19.    In an email dated April 24, 2014, Dr. Miller submitted for IDA's peer review process an article that he allegedly researched and prepared on his own time concerning a

bioengineered viral pandemic—the article was unlike typical IDA articles and Plaintiff intended it for mass publication. *See* [#52 at Ex. 5, IDA015019]; *see also* [*id.* at Ex. 5, IDA015130 (describing the article as "unlike a normal IDA informal paper")]; #43-1 at ¶ 10; #43-6 at 256:7-258:5, 259:23-260:15 (testifying to the differences between an article for mass publication and an IDA paper, explaining that the article needed "some element of drama" and that it need not be as scientifically accurate)].

20.　　Dr. Miller's bioengineered viral pandemic article required several edits prior to publication and received strong criticism from IDA's peer reviewers, including that the fear-based tone needed reworking to an analytical approach, *see* [#43-6 at 259:15-25], that it was "emotional and lacked objectivity," *see* [#43-1 at ¶ 10], and that the "logic [was] faulty" given scientifically questionable statements, *see* [#43-2 at 1-2]. *See also* [#52 at Ex. 5, DM0056, IDA015325-26].

21.　　IDA eventually published the bioengineered viral pandemic article, though Dr. Miller withdrew it from mass publication consideration. *See* [#43-4 at 2; #43-6 at 261:2-9, 263:4-9; #52 at Ex. 4, DM0084; #52 at Ex. 5, DM0058-77]

22.　　Sometime in late 2014, Dr. Miller approached IDA about giving a presentation at a conference on the psychological and societal effects of chemical, biological, radiological, and nuclear events. *See* [#43-1 at ¶ 11; #43-6 at 263:10-20; #52 at Ex. 5, IDA015326].

23.　　Per IDA's requirement, Dr. Miller secured the National Guard Bureau to sponsor the presentation, but rather than give a presentation Plaintiff instead drafted a report for the National Guard Bureau (the "NGB paper") that focused on how people would react to a nuclear weapon detonation or chem-bio attack. *See* [#43 at ¶ 11-12; #43-6 at 263:21-267:17, 290:2-12; #52 at Ex. 5, DM0079, DM0083, DM0085-86].

24.     Dr. Miller submitted the NGB paper for IDA's peer review process; it received grave condemnation, *e.g.*, [#43-10 at 1-6; #43-4; #52 at Ex. 5, IDA000548], which Dr. Miller believes was retaliation for complaining about the six new analysts assigned to the ORAP, *see* [#43-6 at 276:2-17, 277:15-17; #52 at Ex. 5, IDA015326].

25.     About April 28, 2015, Mr. Dominguez informed Plaintiff of a potential conflict of interest with Fortitude Ranch and Plaintiff's chem-bio work for IDA, including the NGB paper and presentation, and directed Plaintiff to cancel the presentation and "not speak or write publically [sic] about any topic that relates to 'chem-bio' pandemics or societal collapse." [#43-1 at ¶¶ 14-17]; *see also* [#43-3; #43-6 at 277:19-278:17; #52 at Ex. 5, DM0088, IDA015326].

26.     While Plaintiff did not agree as to the existence of a potential conflict of interest, he agreed to "follow [Mr. Dominguez's] guidance not to write or speak on bioengineering or collapse." [#43-12 at 1].

27.     On April 29, 2015, in response to the NGB paper, Dr. Grotte levied scientific misconduct charges against Dr. Miller. *See* [#43-1 at ¶ 17; #43-4; #43-6 at 284:7-12].

28.     Beginning in June 2015, IDA conducted a Scientific Misconduct Investigation (the "investigation") into Dr. Miller, *see* [#43-1 at ¶ 18; #43-6 at 284:7-285:11; #52 at Ex. 1, ¶ 32; #52 at Ex. 2, DM0100-13, DM0118-66], an investigation Dr. Miller vehemently disagreed with and believed to be additional whistleblower retaliation, and which caused damage to Dr. Miller's reputation as well as stress and anxiety given the prospects of severe ramifications if found guilty, *see* [#43-6 at 24:13-25:12, 102:5-18, 286:9-287:12, 293:2-7, 332:1-19; #52 at Ex. 1, ¶¶ 32-33; #52 at Ex. 2, DM0118-66; #52 at Ex. 5, IDA000581].

29.     The investigation concluded that Plaintiff <u>had not</u> committed scientific misconduct, but found the NGB paper "was not written in an objective manner," made "misleading statements

and use[d] some references in a deceptive way," and "fail[ed] to meet IDA standards." *See* [#43-5 at 12-13]; *see also* [#52 at Ex. 1, ¶ 33; #52 at Ex. 5, IDA015214-26, IDA015324-27].

30. Given the investigation and its purported ill-effects on Dr. Miller's reputation, Dr. Miller went from a full-time IDA employee back to an adjunct employee, working part-time and with no benefits. *See* [#43-6 at 24:13-25:12; #52 at Ex. 1, ¶¶ 32-33].

31. In or around March 2016, consistent with the investigation's findings and recommendations, *see* [#52 at Ex. 5, IDA000620-29], Mr. Dominguez issued Plaintiff a letter of counseling that admonished Plaintiff for his violations of IDA practices standards, including his purported work on chem-bio related issues on "his own time," and prohibited Plaintiff from working on chem-bio-related projects while employed with IDA or in "academic or professional forums outside of IDA." [#43-16 at 2]; *see also* [#43-1 at ¶ 19; #43-17 (Plaintiff's 2015 Performance evaluation acknowledging the investigation and letter of counseling)].

32. Towards the end of 2016, Dr. Miller published an article titled "The Age of Designer Plagues" in the journal The American Interest—this article did not mention IDA, nor did IDA review the article prior to publication (though "probably 80 percent of it was in an approved IDA paper that was later unapproved") but it was the "same" as Dr. Miller's bioengineered viral pandemic article published in 2014. *See* [#43-1 at ¶ 20; #43-6 at 357:1-358:4].

33. Dr. Grotte alerted Mr. Dominguez to "The Age of Designer Plagues" in email dated January 12, 2017. *See* [#52 at Ex. 9, IDA015227]; *see also* [#43-1 at ¶ 20].

34. Because Mr. Dominguez believed that "The Age of Designer Plagues" violated his prohibition on Plaintiff's ability to speak publicly on or to publish any chem-bio topics while still an IDA employee, Mr. Dominguez, pursuant to the decision of IDA's Vice President, General

Counsel, and Human Resource Director, terminated Dr. Miller on or about January 17, 2017. *See* [#43-1 at ¶¶ 20-21; #43-6 at 358:5-9, 359:11-15].

35.     Following his termination, Plaintiff filed a Whistleblower Reprisal Complaint with the DoD Office of the Inspector General and a "fraud, waste[,] and abuse complaint with [Defense Threat Reduction Agency—a DoD agency]." [#52 at Ex. 1, ¶ 39; #52 at Ex. 2, DM440-42, DM734-35].

36.     Plaintiff initiated this action on October 6, 2017. *See* [#1].

## II.     False Claims Act Retaliation – Claim 1

### A.     Applicable Law

The False Claims Act ("FCA"), 31 U.S.C. § 3729, "covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotation marks omitted). "Because employees will often be in the best position to report frauds perpetrated by their employers, the statute includes a whistleblower provision to protect employees from retaliation." *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613 (10th Cir. 2018) (internal quotation marks omitted). The FCA's anti-retaliation provision provides in pertinent part:

> **(1) In general.**--Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

Like here, in the absence of direct evidence of retaliation, a plaintiff may rely on circumstantial evidence of retaliation under the familiar burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See, e.g.*, *Diaz v. Kaplan Higher Educ. LLC*, 820 F.3d 172, 175 n.3 (5th Cir. 2016); *Harrington v. Aggregate Indus. Ne. Region Inc.*, 668 F.3d 25, 31 (1st Cir. 2012).[4] Under this framework, if Dr. Miller first demonstrates a prima facie case of FCA retaliation, the burden shifts to IDA to provide a legitimate nonretaliatory reason for the adverse employment action. *See Orr v. City of Albuquerque*, 417 F.3d 1444, 1149 (10th Cir. 2005). The burden then shifts back to Dr. Miller to create a triable issue of fact that IDA's proffered reason was pretextual. *See Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010).

### B.    Application

IDA argues that Dr. Miller fails to demonstrate a prima facie FCA retaliation claim because he fails to prove he engaged in a protected FCA activity, or that IDA had notice of such protected FCA activity, or that IDA terminated him "because of" such protected FCA activity. Further, IDA contends that even if Dr. Miller can satisfy his initial burden, IDA provides a legitimate non-discriminatory reason for his termination—a reason Dr. Miller cannot establish as mere pretext. Because the court agrees that Dr. Miller cannot demonstrate a prima facie FCA retaliation claim for want of a causal connection between his protected activity and adverse employment actions, I focus exclusively on that element.

---

[4] The United States Court of Appeals for the Tenth Circuit has not formally adopted the *McDonnell Douglas* burden-shifting framework for FCA retaliation claims, but it impliedly approved of this framework in *United States ex rel. Erickson v. Uintah Special Servs. Dist.*, 268 F. App'x 714, 717-18 (10th Cir. 2008) (affirming the district court's finding that even had the plaintiff made out a prima facie FCA retaliation claim, she failed to establish that the defendant's non-discriminatory reason was pretextual), and other courts in this Circuit have utilized the *McDonnell Douglas* burden-shifting framework for FCA retaliation claims, *e.g.*, *United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1245-46 (D.N.M. 2018); *United States ex rel. Coffman v. City of Leavenworth, Kansas*, 303 F. Supp. 3d 1101, 1122 (D. Kan. 2018); *Armstrong v. Arcanum Grp. Inc.,* No. 16-CV-1015-MSK-CBS, 2017 WL 4236315, at *3 (D. Colo. Sept. 25, 2017). Thus, I analyze Dr. Miller's FCA retaliation claim under the *McDonnell Douglas* burden-shifting framework.

To maintain a viable FCA retaliation claim, Dr. Miller must not only establish that he engaged in a protected activity, *see United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 (4th Cir. 2018) (explaining that a protected activity under the FCA includes "an objectively reasonable belief that the employer is violating, or soon will violate, the FCA."), of which IDA had notice, *see Randazzo v. CH2M Hill, Inc.*, No. 13-CV-03276-MSK-KLM, 2014 WL 4697131, at *4 (D. Colo. Sept. 22, 2014) (defining notice as clearly informing the employer of his belief that such conduct is both unlawful and a fraud against the United States), but that IDA terminated him "because of" his protected FCA activity, *see United States ex rel. King v. Solvay Pharma., Inc.*, 871 F.3d 318, 333 (5th Cir. 2017). *See also Simmons v. Boys & Girls Club of the Pikes Peak Region*, No. 16-CV-01461-RBJ, 2017 WL 4572320, at *7 (D. Colo. Oct. 13, 2017) (identifying the three elements of a FCA retaliation claim). The causation element requires a showing that the protected FCA activity was the "but-for" cause of his termination. *See Armstrong v. Arcanum Grp. Inc.*, No. 16-CV-1015-MSK-CBS, 2017 WL 4236315, at *3 (D. Colo. Sept. 25, 2017) (citing *Schell v. Bluebird Media LLC*, 787 F.3d 1179, 1187 (8th Cir. 2015)).

In determining whether Dr. Miller can establish the requisite causation "[i]t is helpful to begin with isolating the adverse employment action at issue." *Armstrong*, 2017 WL 4236315, at *3. Dr. Miller identifies 11 instances of retaliation (mainly by Dr. Grotte) that he contends occurred because of his protected activity. These include:

1. Reassigning chem-bio work to the six new analysts, forcing Dr. Miler to take leave;

2. Cutting Plaintiff's work hours on an IDA-funded task;

3. Submitting false performance reviews;

4. Removing key portions of Dr. Miller's work from a study he contributed to;

5. Condemning the NGB paper and related presentation;

6. Filing charges of scientific misconduct against Plaintiff;

7. Levying charges of racism and stealing against Plaintiff during the investigation;

8. Levying charges of plagiarism against Plaintiff during the investigation;

9. Creating a hostile work environment and forcing Plaintiff to switch to part-time work;

10. Banning Plaintiff from continued chem-bio work while at IDA; and

11. Reporting "The Age of Designer Plagues" that led to Plaintiff's termination.

*See* [#52 at Ex. 4, DM732];[5] *see also* [#1 at ¶¶ 48-74; #50 at 20-22]. IDA contends that none of these occurrences except for Dr. Miller's termination constitute an adverse employment action and, regardless, Dr. Miller does not and cannot prove that each occurred but-for his protected activity. *See* [#43 at 20-21; #61 at 7-8]. For the following reasons, I conclude that the investigation (and its purported effects) and Dr. Miller's termination are the only occurrences constituting adverse employment actions.

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") liberally defines adverse employment action but does "not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Exby-Stolley v. Bd. of Cty. Commissioners, Weld Cty., Colorado*, 906 F.3d 900, 917 (10th Cir. 2018) (citation and internal quotation marks omitted). Rather, it "includes acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (internal brackets and quotation marks omitted); *cf. Lincoln v. Maketa*, 880

---

[5] Dr. Miller includes a twelfth instance of retaliation, but this occurred <u>after</u> his termination and is therefore not actionable. *See Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 618 (10th Cir. 2018) ("We conclude that the False Claims Act's anti-retaliation provision unambiguously <u>excludes</u> relief for retaliatory acts occurring <u>after</u> the employee has left employment." (emphasis added)).

F.3d 533, 540 (10th Cir. 2018) (noting in Title VII cases that "an adverse employment action is something that would have dissuaded a reasonable worker from making or supporting a charge of discrimination."). But "[adverse employment] actions are not simply limited to monetary losses in the form of wages or benefits." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).

Based on the foregoing, Dr. Miller "must show that the alleged adverse action caused more than *de minimis* harm to or a *de minimis* impact upon [his] job opportunities or status." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (internal quotation marks omitted); *accord Winston v. Ross*, 725 F. App'x 659, 666 (10th Cir. 2018) (explaining, "the Supreme Court [of the United States] distinguished '*material* adversity' from "trivial harms,'" with only the former constituting adverse employment actions (emphasis in original)). While the first two instances involve an alleged diminishment in Dr. Miller's work, Dr. Miller provides no evidence to support his claim that these changes were sufficiently significant to constitute an adverse employment action under controlling Tenth Circuit law.[6] The same is true for instances 3-5, which appear to be more of an inconvenience rather than a materially adverse change to Dr. Miller's employment with IDA. *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004) (noting that inconveniences and alterations to job responsibilities are not adverse employment actions); *cf. Amro v. Boeing Co.*, 232 F.3d 790, 799 (10th Cir. 2000) (holding that the employee's

---

[6] Dr. Miller argues in his Response that the shifting of responsibilities away from him to the six junior analysts forced him to take leave to cover his hours while looking for work, and that he was the only IDA employee treated this way. *See* [#50 at 6 ¶ C]. But he provides no evidence to the court regarding this occurrence, or that his salary or pay was reduced in any manner, or that this diminished his employment in any other aspect in more than a *de minimis* manner. Indeed, these occurred in December 2013 and January 2014, respectively, but Plaintiff remained employed with IDA until January 2017—an additional three years. As discussed above, at the summary judgment phase, Dr. Miller must point to competent summary judgment evidence and may not rely on mere re-argument of his case.

"unhappiness" with performance evaluations were not adverse employment action where the employee failed to demonstrate an entitlement to a higher ranking); *Strain v. Univ. of Pittsburgh Med. Ctr.*, No. 2:04–1660, 2007 WL 951490 (W.D. Pa. Mar. 27, 2007) (relieving plaintiff of certain duties, lateral transfer, and *warranted* negative performance evaluation not adverse actions).

But instances 6-10, all of which concern the investigation and its consequences, and instance 11, Plaintiff's termination, <u>did</u> result in significant changes to Dr. Miller's employment status. As to the investigation, Dr. Miller testified that it caused damage to his reputation as well as stress and anxiety given the prospects of severe ramifications if found guilty. *See* [#43-6 at 24:13-25:12, 102:5-18, 286:9-287:12, 293:2-7, 332:1-19; #52 at Ex. 1, ¶¶ 32-33; #52 at Ex. 2, DM0118-66; #52 at Ex. 5, IDA000581]. The Tenth Circuit has held that adverse employment actions encompass those "that carry 'a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects.'" *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)). Further, the investigation led to a prohibition on Plaintiff's ability to work on chem-bio topics while still employed by IDA, both professionally and personally, *see* [#43-16 at 2; #43-1 at ¶ 19; #43-17], and forced him to revert to a part-time employee with no benefits, *see* [#43-6 at 24:13-25:12; #52 at Ex. 1, ¶¶ 32-33]. These ramifications, much like Plaintiff's termination, constitute an adverse employment action. *See Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). With these adverse employment actions identified, I now consider whether Dr. Miller creates a triable issue of material fact that his protected activity was the but-for cause of such actions.

Dr. Miller argues that he proffers direct evidence of retaliation, *see* [#50 at 20, 22], but in evaluating the evidence before it, the court concludes that nothing in the record "proves the

15

existence of a fact in issue [i.e., that IDA retaliated against Dr. Miller because of his protected activity] without inference or presumption." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (internal quotation marks omitted). Indeed, Plaintiff later asserts that circumstantial evidence establishes the temporal proximity between the protected activity and adverse employment actions. *See* [#50 at 20-24]; *accord Simmons*, 2017 WL 4572320, at *9 ("Courts have indeed considered the temporal proximity between an employee's ostensibly protected activity and subsequent adverse employment action."). He also contends, much like his arguments of pretext, that the investigation was a sham, intended only to harass and retaliate against him, and that IDA subjected no other employee to such conduct. *See* [#50 at 20-24].

Though the Tenth Circuit recognizes the use of circumstantial evidence that "justif[ies] an inference of retaliatory motive, such as protected conduct closely followed by adverse action," *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982), Dr. Miller fails to make that showing here. Rather, he bases his assertions on speculation, and the undisputed material facts do not establish an inference of a retaliatory motive based on his protected activity prior to the investigation.[7] For instance, Dr. Miller complained about the assignment of the six new analysts "[w]ithin days to weeks" of their September 2013 assignment to the ORAP and generally throughout the fall of 2013, *see* [#43-6 at 141:15-18; #52 at Ex. 1, ¶ 29; #52 at Ex. 5, IDA015324]; he raised concerns with Dr. Grotte's use of government funds about April 9, 2014, *see* [#43-6 at 178:12-20; #43-8 at 1-3; #52 at Ex. 2, DM0034-35], and as late as possibly November 2014, *see* [#52 at Ex. 2, DM0078]. But Dr. Grotte did not levy scientific misconduct allegations against Plaintiff until April 29, 2015, based the NGB paper, and his termination did not occur until January

---

[7] Dr. Miller indeed raised his belief that the investigation was retaliation for his protected activity but did so in response to the investigation, *e.g.*, [#52 at Ex. 2, DM121, DM122, DM124, DM160; #52 at Ex. 5, IDA000581, IDA015150], and thus it is immaterial to whether the protected activity was the but-for cause of the investigation itself.

2017. Thus, the month's and year's long gaps between the protected activity and the adverse employment actions fail to support an inference of retaliation. *See Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1267 (10th Cir. 2009) (finding a five-month gap insufficient to create a triable issue of material fact as to retaliation; approving the notion that "when the adverse action occurs on the heels of protected activity, such a circumstance would be limited to matters occurring within days, or at most, weeks of each other" but not where "months separated the alleged protected activity and adverse action."); *cf. United States ex rel King v. Solvay Pharm., Inc*., 871 F.3d 318, 334 (5th Cir. 2017) (finding as insufficient evidence of causation on summary judgment the plaintiffs' "evidence of both being terminated at least three-and-a-half months after making their complaints and positive performance reviews prior to their terminations").

Moreover, Dr. Miller fails to create a triable issue of material fact as to the proffered reasons for the adverse employment actions. That is, the undisputed material facts demonstrate that Defendant had non-retaliatory reasons for the adverse employment actions, i.e., concerns with Dr. Miller's NGB paper, his potential conflict of interest with Fortitude Ranch, and his violation of Mr. Dominguez's directive to not work on chem-bio topics while still employed by IDA. *See* [#43-1 at ¶¶ 17, 19, 20-21; #43-4; #43-6 at 284:7-12, 357:1-358:4, 358:5-9, 359:11-15 (admitting that the publication of "The Age of Designer Plagues" violated Mr. Dominguez's directive not to publish material on chem-bio topics); #43-16 at 2; #43-17]; *cf. McAllan v. Von Essen*, 517 F. Supp. 2d 672, 686 (S.D.N.Y. 2007) (dismissing the plaintiff's FCA retaliation claim, because the plaintiff proffered no evidence of a temporal proximity between the protected activity and adverse employment activity and plaintiff failed to refute the evidence that the defendant would take the same actions regardless of the FCA suit). Though Plaintiff seeks to cast doubt on the veracity of these material facts, he fails to proffer any admissible evidence to establish a triable issue as to

causation. *See Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment."). Further, "mistaken belief[s] can be legitimate, non-pretextual reason[s] for an employment decision," *Riggs*, 497 F.3d at 1119, and Dr. Miller's passionate disagreements with IDA's proffered reasons do not create genuine disputes of material fact as to whether IDA truly believed these reasons, *see id.* Upon the record before it, I conclude that Dr. Miller has failed to carry his burden of setting forth sufficient evidence, taken in the light most favorable to him, for a factfinder to conclude that any protected activity was the but-for cause of, or that it was the factor that made a difference for, the adverse employment actions. *Cf. Jones*, 617 F.3d at 1277-78 (noting that under the Age Discrimination in Employment Act but-for causation does not require a showing that age was the sole motivating factor, but was the factor that made a difference).

For these reasons, I find that Dr. Miller fails to demonstrate a prima facie FCA retaliation claim for want of a causal connection between his protected activity and the adverse employment actions. Therefore, the court **GRANTS** IDA's Motion for Summary Judgment as to Plaintiff's FCA retaliation claim and **DISMISSES with prejudice** Claim 1.

## III. Defense Contractor Whistleblower Protection Act Retaliation – Claim 2

### A. Applicable Law

The Defense Contractor Whistleblower Protection Act ("DCWPA") prohibits the discharge, demotion, or discrimination against contractors, subcontractors, or their employees

> as reprisal for disclosing to a person or body . . . information that the employee reasonably believes is evidence of . . . [g]ross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, an abuse of authority relating to a Department contract or grant, or a violation of law, rule, or regulation related to a Department contract (including the competition for or negotiation of a contract) or grant.

10 U.S.C. § 2409(a)(1)(A). To succeed on a DCWPA retaliation claim Dr. Miller must demonstrate (1) he engaged in a protected activity as described under the statute, (2) IDA knew or had reasonable notice of the protected activity, and (3) his protected activity was a contributing factor in the adverse employment action unless (4) IDA establishes with clear and convincing evidence that it would have taken the employment action despite the protected activity. *See Cejka v. Vectrus Sys. Corp.*, 292 F. Supp. 3d 1175, 1192 (D. Colo. 2018); *see also* 10 U.S.C. § 2409(c)(6) (providing that the legal burdens of proof under 5 U.S.C. § 1221(e) govern DCWPA claims).

## B. Application

IDA moves for summary judgment on Claim 2 because Dr. Miller did not complain about the gross mismanagement, gross misuse, or gross waste of DoD funds, but rather complained only about the ineptitude of the junior analysts. Additionally, IDA contends that its employment actions against Plaintiff had no relation to Plaintiff's protected activity. *See* [#43 at 26; #61 at 8-9]. For many of the same reasons discussed above, I conclude that Dr. Miller fails to establish a DCWPA retaliation claim for want of a causal connection between his protected activity and the adverse employment actions.

Again, assuming Dr. Miller engaged in protected activity, *see United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 621 (E.D. Va. 2016) (finding, "the DCWPA would appear to include as 'protected activity' any conduct protected under the FCA."), of which IDA had notice, *see id.* at 622, Dr. Miller would still need to establish that the protected activity was a contributing factor in the adverse employment actions, *see Cejka*, 292 F. Supp. 3d at 1192. To constitute a contributing factor, Dr. Miller must show that the protected activity was a "'factor, which alone or in combination with other factors, tend[ed] to affect in any way the outcome of the decision.'" *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 178 (4th Cir.

2018) (quoting *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)).  This Dr. Miller fails to do.

In support of his DCWPA retaliation claim, Dr. Miller again relies on the alleged retaliation related to his FCA retaliation claim.  He believes these instances of alleged retaliation establish that his protected activity was at least a contributing factor for the adverse employment actions.  But as discussed above, Plaintiff fails to demonstrate a temporal proximity between his protected activity and the adverse employment actions such that the court could draw the inference of retaliation.  *See Brach v. Conflict Kinetics Corp.*, No. 1:16-CV-978, 2017 WL 3267961, at **16-17 (E.D. Va. July 31, 2017) (holding that the plaintiff failed to establish causation in support of his DCWPA retaliation claim because the four-month gap between the protected activity and adverse employment action and the plaintiff's continued employment did not support an inference of retaliation).  And Plaintiff fails to proffer any other evidence sufficient to withstand summary judgment as to the causal connection between any protected activity and the adverse employment actions.  Further, Dr. Miller does not offer admissible evidence to rebut IDA's reasons for the adverse employment actions and create a triable issue that IDA would <u>not</u> have taken the adverse employment actions despite Dr. Miller's protected activity.  *See Cejka*, 292 F. Supp. 3d at 1192.

Based on the foregoing, I conclude that Plaintiff fails to create a triable issue of material fact that his protected activity was a contributing factor in the adverse employment actions.  Additionally, the undisputed material facts demonstrate that IDA would have taken the adverse employment actions despite the protected activity.  Thus, the court **GRANTS** IDA's Motion for Summary Judgment as to Plaintiff's DCWPA retaliation claim and **DISMISSES with prejudice** Claim 2.

**IV.    Termination for Lawful Off-Duty Activity - Claim 5**

**A.    Applicable Law**

Colo. Rev. Stat. § 24-34-402.5 (the "Lawful Activities Statute") deems it a "discriminatory or unfair employment practice" to terminate an employee based on the "employee's engaging in any lawful activity off the premises of the employer during nonworking hours[.]"  This includes "lawful, off-duty conduct, whether or not work-related." *Watson v. Pub. Serv. Co. of Colo.*, 207 P.3d 860, 865 (Colo. App. 2008) (applying § 24-34-402.5 to the plaintiff's OHSA complaint).  "To state a claim under the [Lawful Activities] Statute, a plaintiff must show that he: (1) engaged in a lawful activity off the premises of an employer during nonworking hours; and (2) was terminated for engaging in this activity." *Easley v. Fairway Indep. Mortg. Corp.*, No. 15-CV-02290-MEH, 2016 WL 614481, at *2 (D. Colo. Feb. 16, 2016).

Two exceptions exist to the Lawful Activities Statute's protections.  These include any restriction that:

> (a) Relates to a bona fide occupational requirement or is reasonably and rationally related to the employment activities and responsibilities of a particular employee or a particular group of employees, rather than to all employees of the employer; or
>
> (b) Is necessary to avoid a conflict of interest with any responsibilities to the employer or the appearance of such a conflict of interest.

Colo. Rev. Stat. §§ 24-34-402.5(1)(a),(b).  "The statute thus reflects a legislative attempt to balance an employee's right to engage in lawful activity away from work with an employer's legitimate business interests and needs." *Ruiz v. Hope for Children, Inc.*, 352 P.3d 983, 985-86 (Colo. App. 2013).

**B.    Application**

Defendant implicitly concedes that Plaintiff engaged in lawful off-duty conduct when publishing "The Age of Designer Plagues" and that this lawful off-duty conduct resulted in his

termination. *See* [#43-1 at ¶¶ 20-21; #43-6 at 357:1-358:4, 358:5-9, 359:11-15]. IDA moves for summary judgment on Claim 5, however, arguing that IDA's termination of Dr. Miller related to a bona fide occupational requirement, i.e., that Dr. Miller not write or speak on chem-bio topics while employed with IDA, and was necessary to avoid a conflict of interest (or appearance thereof) between Dr. Miller's responsibilities with IDA and his interests in Fortitude Ranch. *See* [#43 at 27-28; #61 at 9]. Because I agree with IDA's first argument, I focus solely on it.

IDA contends that Mr. Dominguez's directive to Plaintiff not to write on any chem-bio related topics, both personally and professionally, while still employed by IDA constituted a bona fide occupational requirement, because "IDA's reputation for impartiality could be seriously damaged by an employee publishing articles warning of an imminent biological pandemic while simultaneously earning personal revenue by selling memberships to a community designed to survive just such a disaster." *See* [#43 at 27]. To this court's knowledge, only one court has considered this exception to a claim under the Lawful Activities Statute.[8]

In *Marsh v. Delta Air Lines, Incorporated*, a court in this District considered a Lawful Activities Statute claim predicated on the plaintiff's termination following his publication of an opinion letter in the Denver Post that was critical of the defendant. *See* 952 F. Supp. 1458, 1462 (D. Colo. 1997). The *Marsh* court found that by providing exceptions to the Lawful Activities Statute, the Colorado legislature created a check on an employee's ability "to strike indiscriminate public blows against the business reputation of their employer." *Id.* at 1463. The *Marsh* court thus concluded "that one of the bona fide occupational requirements encompassed within the scope of [the Lawful Activities Statute] is an implied duty of loyalty, with regard to public

---

[8] *See Finau v. Mountain Prairie, LLC*, No. 15-CV-00322-MSK-KLM, 2015 WL 13236346, at *3 n.2 (D. Colo. Dec. 18, 2015) (noting the dearth of case law, both state and federal, concerning the Lawful Activities Statute).

communications, that employees owe to their employers." *Id.* The plaintiff's harsh public criticism of the defendant, based on his frustrations with the defendant's treatment of its employees, therefore breached this bona fide occupational requirement. *See id.*

Here, the court cannot categorize the purported bona fide occupational requirement as one of loyalty like in *Marsh*. And the Lawful Activities Statute does not define the term bona fide occupational requirement. But the Colorado Supreme Court has held that bona fide, as used in another Colorado statute, means in good faith, honestly, and sincerely. *See People v. Terry*, 720 P.2d 125, 127 (Colo. 1986). Thus, in affording the phrase "bona fide occupational requirement" its plain and ordinary meaning, *see State v. Nieto*, 993 P.2d 493, 500 (Colo. 2000), I conclude that a bona fide occupational requirement is one that an employer imposes in good faith, honestly, and sincerely. Because this is an affirmative defense, IDA bears the burden of proving the absence of any disputed material fact to the defense asserted. *See Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011).

Though not specifically cited in its Motion, IDA offers the Declaration of Mr. Dominguez, who was the Director of Strategy, Forces, and Resources during the time period relevant to Dr. Miller's claims. [#43-1 at ¶ 2]. Mr. Dominguez declared that in April 2015 he reported a potential conflict of interest involving Dr. Miller's management/ownership role in Fortitude Ranch. Specifically, Mr. Dominguez stated, "I was concerned because Fortitude Ranch involved subject matter (disaster preparation, global pandemics, etc.) that overlapped with portions of IDA's work in general, and some of Dr. Miller's work at IDA in particular." [*Id.* at ¶ 14]. Mr. Dominguez went on to explain,

> I feared that the appearance of the identical statements on both IDA publications and Fortitude Ranch publications could create the perception of a link between the two, which would compromise IDA's reputation for objectivity. I also viewed Fortitude Ranch as a potential conflict because it could appear to others that Dr.

> Miller might be motivated to achieve personal profit from his efforts, through IDA, by publicizing or possibly even exaggerating the likelihood of bioengineered viral pandemic.

[*Id.*]. Other evidence in the record, including electronic mail messages, reflect contemporaneous communications by other colleagues voicing concerns regarding Dr. Miller's pandemic work. [#43-2; #43-3].

Dr. Miller contends that IDA fails to proffer any evidence that "it applied and enforced occupational requirements regarding publications by employees like me innocently rather than pretextually, and consistently, sincerely, and in good faith." [#50 at 27 (brackets and internal quotation marks omitted)]. Further, Dr. Miller argues that there was no bona fide occupational requirement that he not write or speak on chem-bio topics because he "no longer was allowed to work in these areas at IDA." [*Id.* at 28]. Respectfully, for many of the same reasons discussed above, *see supra* §§ II.B., III.B., I conclude that Plaintiff fails to create a triable issue of material fact that the prohibition on his ability to write or speak on chem-bio topics while employed with IDA <u>was not</u> a bona fide occupational requirement.

To start, as IDA's correctly notes, the court finds misplaced Plaintiff's reliance on *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202-03 (10th Cir. 2007) and *Pogue v. United States Department of Labor*, 940 F.2d 1287, 1291 (9th Cir. 1991). Neither case dealt with the Lawful Activities Statute. *Brammer-Hoelter* dealt with <u>public</u> sector employees and their three discrete claims under the First Amendment, *see* 492 F.3d at 1202-03, so whether "The Age of Designer Plagues" constituted a matter of public concern or whether IDA restrained Plaintiff's freedom of speech is immaterial. *Pogue*, on the other hand, dealt with whether evidence supported an Administrative Law Judge's determination that the United States Navy's discipline of the plaintiff was not in retaliation for her whistleblowing. *See* 940 F.2d at 1291. While *Pogue*

may suggest that consideration of one's motives may depend on credibility assessments, the court does not find that such a circumstance exists here.

Next, as discussed above, the court finds no evidence to support Dr. Miller's assertions that IDA implemented the prohibition on his ability to write and speak on chem-bio topics while employed at IDA in bad faith or for some nefarious purpose. Rather, the undisputed material facts establish that IDA imposed this prohibition because it believed Dr. Miller lacked objectivity in this area—a pillar of IDA's mission and essential to its business reputation, *see* [#43-11 at 2]—given Dr. Miller's personal interest in this area and a potential conflict of interest with his ownership interest in Fortitude Ranch, *see, e.g.*, [#43-1 at ¶¶ 10, 14-17, 19; #43-3; #43-4; #43-6 at 277:19-278:17; #43-10 at 1-6; #43-11 at 2; #43-12; #43-16 at 2; #52 at Ex. 5, IDA000548]. Dr. Miller's general denials and disagreements do not create a triable issue as to the evidence proffered by IDA. *See Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (stating that if the defendant meets its initial burden on summary judgment as to its affirmative defense, then the plaintiff must "demonstrate with <u>specificity</u> the existence of a disputed material fact." (emphasis added)). Nor does Dr. Miller proffer any evidence suggesting that IDA treated him differently than other IDA employees.

On this record, I find that Dr. Miller has failed to adduce sufficient evidence at this stage to create a triable issue on IDA's invocation of the bona fide occupational requirement, and thus Claim 5 fails under § 24-34-402.5(1)(a). *Cf. Concrete Works of Colorado, Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (stating that "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment in favor of the moving party is proper." (brackets and internal quotation marks omitted)). The court therefore

**GRANTS** IDA's Motion for Summary Judgment as to Plaintiff's Lawful Activities Statute claim and **DISMISSES with prejudice** Claim 5.

## V.     Unlawful Prevention of an Employee's Political Participation – Claim 6

Colo. Rev. Stat. § 8-2-108 prohibits any employer from "mak[ing], adopt[ing], or enforc[ing] any rule, regulation, or policy forbidding or preventing any of his employees from engaging or participating in politics or from becoming a candidate for public office or being elected to and entering upon the duties of any public office." Colo. Rev. Stat. § 8-2-108(1). IDA moves for summary judgment on Claim 6 for two reasons: (1) it is untimely and (2) it fails as a matter of law given IDA's actions were necessary to avoid a conflict of interest or appearance thereof between Dr. Miller's letter to the Wall Street Journal and his responsibilities with IDA. *See* [#43 at 28-29; #61 at 10-11]. The court respectfully concludes that Claim 6 is untimely, and therefore focuses solely on IDA's first argument.

Under Colorado law, certain actions "must be commenced within two years after the cause of action accrues, and not thereafter[.]" Colo. Rev. Stat. § 13-80-102(1). Relevant here, this includes "[a]ll other actions of every kind for which no other period of limitation is provided[.]" *Id.* § 102(1)(i). Section 8-2-108 is silent as to an applicable statute of limitations. *See* Colo. Rev. Stat. §§ 8-2-108(1)-(2). And because a claim brought pursuant to § 8-2-108 constitutes an "other action[] of every kind," *cf. Kennett v. Bayada Home Health Care, Inc.*, 135 F. Supp. 3d 1232, 1241 (D. Colo. 2015) (explaining that courts construe Colorado statutes according to their plain and ordinary meaning), a two-year statute of limitations applies to Claim 6.

It is undisputed that Dr. Miller sought and Mr. Dominguez denied Plaintiff's request to publish a letter in the Wall Street Journal supporting the nomination of then-Senator Chuck Hagel as Secretary of Defense in January 2013. *See* [#43-1 at ¶ 22; #43-18; #52 at Ex. 7, IDA 000599].

Claim 6 therefore accrued in January 2013. *See Broomfield Senior Living Owner, LLC v. R.G. Brinkmann Co.*, 413 P.3d 219, 226 (Colo. App. 2017) ("A claim in a civil action accrues 'on the date *both the injury and its cause* are known or should have been known by the exercise of reasonable diligence.'" (emphasis in original) (quoting Colo. Rev. Stat. § 13-80-108(1))); *see also* Colo. Rev. Stat. § 13-80-108(8) ("A cause of action for losses or damages not otherwise enumerated in this article shall be deemed to accrue when the injury, loss, damage, or conduct giving rise to the cause of action is discovered or should have been discovered by the exercise of reasonable diligence."). Dr. Miller did not file suit until October 2017, *see* [#1], which falls outside the applicable two-year statute of limitations. Accordingly, the court **GRANTS** IDA's Motion for Summary Judgment as to Plaintiff's unlawful prevention of an employee's political participation claim and **DISMISSES with prejudice** Claim 6.

## CONCLUSION

Therefore, **IT IS ORDERED** that:

(1)     IDA's Motion for Summary Judgment [#43] is **GRANTED**;

(2)     Summary Judgment shall enter in favor of Defendant and against Plaintiff, and Plaintiff's Complaint [#1] and remaining claims are **DISMISSED with prejudice**;

(3)     The Clerk of the Court shall enter Final Judgment in favor of Defendant and against Plaintiff, with each party bearing their own costs and fees;[9]

---

[9] While costs should generally "be allowed to the prevailing party," Fed. R. Civ. P. 54(d)(1), the district court may in its discretion decline to award costs where a "valid reason" exists for the decision. *See, e.g., In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1144, 1147 (10th Cir. 2009) (citations omitted). Because the issues presented in this matter were unique and complex, this court declines to award fees to Defendant. *See Cantrell v. Int'l Bhd. of Elec. Workers, AFL-CIO, Local 2021*, 69 F.3d 456, 459 (10th Cir. 1995) (noting that there is no abuse of discretion when the district court denies fees where the "issues are close and difficult," or where the prevailing party is only partially successful).

(4)     IDA's Motion to Quash Subpoena to Appear and Testify at Hearing or Trial In A

Civil Action Directed to David Chu [#72] is **DENIED AS MOOT**;

(5)     "Plaintiff's Reply in Opposition to Defendants' Motion to Quash Subpoena of Dr.

Chu and Plaintiff Motion to Allow Witnesses to Testify By Video" [#74] is

**DENIED AS MOOT**; and

(6)     A copy of this Order shall be sent to the following:

Drew Miller
1855 Smoke Ridge Drive
Colorado Springs, CO 80919


DATED: February 26, 2019                                    BY THE COURT:

                                                            _____
                                                            Nina Y. Wang
                                                            United States Magistrate Judge